BURLINGTON NORTHERN, INC., et al.,
Appellees,

v.

INTERSTATE COMMERCE COMMIS-
SION, et al., Appellants.

BURLINGTON NORTHERN, INC.,
Appellant,

v.

INTERSTATE COMMERCE COMMIS-
SION, et al.

Nos. 71–1087, 71–1199.

United States Court of Appeals,
District of Columbia. Circuit.

Argued June 16, 1971.

Decided Jan. 31, 1972.

Rehearing En Banc Denied in No. 71–1087
May 17, 1972.

Mr. Raymond D. Battocchi, Atty., Department of Justice, with whom Mr. L. Patrick Gray, III, Asst. Atty. Gen., Messrs. Thomas A. Flannery, U. S. Atty., at the time the brief was filed, Morton Hollander, Atty., Department of Justice, Fritz R. Kahn, General Counsel, Interstate Commerce Commission, and Leonard S. Goodman, Associate Gen. Counsel, Interstate Commerce Commission, were on the brief for appellants in

No. 71–1087 and appellees in No. 71–1199.

Mr. Richard J. Flynn, Washington, D.C., with whom Mr. Richard G. Clemons, Washington, D.C., was on the brief, for appellees in No. 71–1087 and appellants in No. 71–1199.

Mr. Peter S. Craig, Washington, D.C., filed a brief on behalf of Southern Railway Company, et al., as amici curiae, urging affirmance.

Before WILBUR K. MILLER, Senior Circuit Judge, and TAMM and ROBB, Circuit Judges.

ROBB, Circuit Judge:

Burlington Northern, Inc., a common carrier by railroad subject to the jurisdiction of the Interstate Commerce Commission, filed this action in the district court against the Commission and Matthew Paolo, Director of the Commission's Bureau of Accounts.[1] The complaint sought a declaration of Burlington Northern's rights and injunctive relief against a formal demand for examination of records served upon the railroad by the Commission. The demand, upon the purported authority of section 20(5) of the Interstate Commerce Act, 49 U.S.C. § 20(5) (1970), called for the production for inspection and examination of Burlington Northern's 1970 and current budget forecasts, including cash flow and income forecasts, together with all related working papers and interpretative material. The Commission filed an answer admitting the allegations of fact contained in the complaint and praying that the action be dismissed. The United States intervened, adopted the answer of the Commission, and counterclaimed. The counterclaim asked the court to order Burlington Northern to comply with the Commission's demand, and to assess against the railroad the statutory forfeiture of $500.00 for each day it continued its refusal to comply with the demand. Thereafter cross-motions for summary judgment were filed, supported by affidavits. Holding that the demand was not authorized by section 20(5) of the Interstate Commerce Act, the district court granted Burlington Northern's motion, dismissed the counterclaim, and denied the government's motion for summary judgment. Burlington Northern, Inc. v. Interstate Commerce Commission, 323 F.Supp. 273 (D.D.C.1971). We affirm the judgment of the district court.

The facts appear in the pleadings and affidavits filed in the district court, and so far as material here, are not in dispute. The controversy had its origin in a hearing before the Subcommittee on Surface Transportation of the Committee on Commerce of the United States Senate. Prompted by the bankruptcy of the Penn Central Railroad the Subcommittee was considering legislation to provide financial assistance to certain railroads. During the hearing on June 23, 1970 Senator Hartke told Commissioner Tuggle of the ICC that the Subcommittee needed a list of the railroads which were prospective applicants for loan guarantees. (A. 115) The following exchange then took place:

Senator Hartke. Let me ask you this: Do you or do you not now have a list of railroads which will in your opinion be asking for assistance under a loan guarantee bill of the type which is presently proposed for the Congress to consider?

Mr. Tuggle. Not in our opinion. But we can examine our records and see the railroads that are marginal or losing money. We formed no opinion about it yet, but we can easily evaluate the railroads that appear to be needing help.

Senator Hartke. In other words, you can provide for us relevant financial information about these railroads, showing their current financial condition, together with the financial forecasts made by the railroad.

Can you do that?

---

1. W. N. Ernzen, Vice President—Finance of Burlington Northern, Inc., was orig-

inally a plaintiff but by stipulation of the parties was withdrawn from the action.

Mr. Tuggle. We can show their financial condition according to our records. We can't give you the railroads' forecast.

\* \* \* \* \* \*

Mr. Tuggle. We don't know what their financial forecasts are. They don't file them with us.

Senator Hartke. Can you ask them for it?

Mr. Tuggle. We can do that.

Senator Hartke. And will you give us their reply?

Mr. Tuggle. Yes.

Senator Hartke. If they give you a financial forecast, give us that. If they refuse to give it to you, will you report that to us?

Mr. Tuggle. Yes, we would be glad to do that.

\* \* \* \* \* \*

Senator Hartke. \* \* \* So I am going to ask you to do that and also give us, as soon as possible, an estimate of the time in which you can give us the financial forecasts of the railroads.

Mr. Tuggle. Senator, let's get this straight. We write them and request it. They may write back and want to know more specifically what we want, things of that kind. That is completely beyond our control.

Senator Hartke. I am not saying it is within your control. But if they plan to come in and ask for money under this Act, I would think they would be in a position now to inform (?) the ones that are coming. (A. 115–119)

The government does not contend that Burlington Northern was a "marginal" railroad, likely to apply for a loan guarantee. Nevertheless, on July 17, 1970, Mr. Paolo wrote to Burlington Northern and other major railroads, referring to the request for financial forecasts, and stating:

> You are, therefore, requested to furnish information which we will pass on to the Senate Committee, concerning a financial forecast for your railroad including an income statement and a cash flow statement projected forward to December 31, 1970. (A. 134)

By letter of August 4, 1970 Burlington Northern responded to Mr. Paolo's request. The railroad's letter recited various contingencies and imponderable factors which precluded reliable predictions of the company's income and cash flow.[2] The letter concluded with the statement that Burlington Northern expected that its net income for 1970 "will be somewhat less than the pro forma earnings of the constituent companies, before special charges, for the year 1969" and that "by the end of 1970 cash will be down somewhat from the amounts on hand at the beginning of the year but still at a level adequate for working purposes." (A. 135)

On September 4, 1970 Mr. Paolo again wrote to Burlington Northern requesting information about the company's current dividend policies. He referred in particular to the railroad's 1970 dividend declarations, and asked for copies of the minutes of the meetings of the Board of Directors at which the dividends were declared, together with copies of all documents furnished members of the Board in their deliberation. He asked further for copies of Burlington Northern's cash flow and income forecasts for 1970 and 1971.

At a meeting with Mr. Paolo on September 25, 1970, representatives of the railroad explained the declarations of dividends and agreed to furnish all the material he had requested, except forecasts. Thereafter the company did fur-

---

2. Among the factors listed by Burlington Northern in the letter were the uncertainties of crop production and the ability of cars to move the harvest at the proper time, the action of Congress on legislation affecting the railroad industry, labor contract negotiations, Commission action on proposed rate increases, and uncertainties resulting because 1970 was the first year of merged operations for the Burlington Northern.

nish the requested material, except forecasts, and in addition offered to provide current financial data on a monthly basis.

On September 25, 1970 Mr. Paolo by letter repeated his request that Burlington Northern submit "actual pro forma-type statements detailing the items generally found in income and cash flow statements. . . ." (A. 136–37). He requested such statements for the last quarter of 1970 and projected income and cash flow statements for the full year 1970. When Burlington Northern declined to comply with this request the Commission served upon the railroad the "Formal Demand for Examination of Records" which is challenged by Burlington Northern in this action. The demand, purporting to be under the authority of section 20(5) of the Interstate Commerce Act, called for inspection and examination of:

(1) Burlington Northern, Inc., 1970 budget forecast including but not limited to items pertaining to cash flow forecast and income forecast, together with associated working papers and interpretative material including but not limited to summarizations of any phase of the forecast.

(2) Burlington Northern, Inc. most current budget forecast including but not limited to items pertaining to cash flow forecast and income forecast, together with associated working papers and interpretative material including but not limited to summarizations of any phase of the foregoing forecast.

(3) Burlington Northern, Inc., all analyses, working papers, preliminary studies, interpretative material and summarizations presently on hand and in the making as subject matter for the next budget forecast of the nature indicated in (1) and (2) above.

(4) All documents showing variances between the Burlington Northern, Inc., budget forecasts and actual performance for each month and/or quarter of the calendar year 1970. (A. 40)

In conclusion, the demand directed the railroad's attention to section 20(7) (a) of the Interstate Commerce Act, 49 U.S. C. § 20(7) (a) (1970), providing that failure or refusal to comply subjects the railroad to a forfeiture of not to exceed $500.00 for each day of default. Burlington Northern declined to comply, and this action followed.

The Commission contends that its demand is authorized by section 20(5) of the Interstate Commerce Act, 49 U.S.C. § 20(5) (1970).[3] That section authorizes the Commission to "prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers and their lessors, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys. . . ." The Commission is further au-

---

3. Section 20(5) provides, in pertinent part:
   The Commission may, in its discretion, prescribe the forms of any and all accounts, records, and memoranda to be kept by carriers and their lessors, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of moneys, and it shall be unlawful for such carriers or lessors to keep any accounts, records, and memoranda contrary to any rules, regulations, or orders of the Commission with respect thereto. The Commission or any duly authorized special agent, accountant, or examiner thereof shall at all times have authority to inspect and copy any and all accounts, books, records, memoranda, correspondence, and other documents, of such carriers, lessors, and associations, and such accounts, books, records, memoranda, correspondence, and other documents, of any person controlling, controlled by, or under common control with any such carrier, as the Commission deems relevant to such person's relation to or transactions with such carrier. * * * Such carriers, lessors, and other persons shall submit their accounts, books, records, memoranda, correspondence, and other documents for the inspection and copying authorized by this paragraph, * * * to any duly authorized special agent, accountant, or examiner of the Commission, upon demand and the display of proper credentials. 49 U.S.C. § 20(5) (1970).

thorized "to inspect and copy any and all accounts, books, records, memoranda, correspondence, and other documents of such carriers, lessors, and associations. . . ."

The Commission argues that under section 20(5) it may demand budget, cash flow and income forecasts pursuant to its authority to inspect "memoranda, correspondence, and other documents" of the railroads. This construction of section 20(5) would give the Commission under that section general investigatory powers not necessarily related to the Commission's authority to prescribe the forms of accounts and records. It would extend the scope of section 20(5) to give the Commission unlimited access to all the papers and documents of the railroad relating even remotely to the regulatory interests of the Commission.

Burlington Northern on the other hand contends that the inspection provided by section 20(5) must be limited to the prescribed or authorized accounting and corporate records of the carrier, and to the correspondence, memoranda, and other documents providing background or explanatory material which would assist an auditor in understanding entries in those records. Projections and internal forecasts, according to Burlington Northern, may not be inspected under section 20(5) because they do not relate to or explain historical or current records over which the Commission has regulatory power. The district court agreed with Burlington Northern. We think the district court was right.

Since the answer to the problem confronting us is not apparent on the face of the statute, we turn to its legislative history and background.

Section 20 of the Act of February 4, 1887, 24 Stat. 386–87, authorized the Interstate Commerce Commission to require annual reports from all common carriers subject to its jurisdiction, and to prescribe uniform methods of keeping the carriers' accounts. Section 20 was amended by section 7 of the Hepburn Act of 1906, 34 Stat. 593–95, to provide among other things that the "Commission shall at all times have access to all accounts, records, and memoranda kept by carriers subject to this Act. . . ." 34 Stat. 594 (1906). As stated in the House Report on the bill, submitted by Mr. Hepburn, the purpose of the bill was to enlarge the power of the Interstate Commerce Commission to remedy the evils of rebates and other forms of discrimination in rates practiced by the carriers.[4] H.R.Rep.No.591, 59th Cong., 1st Sess. 2 (1906).

The Twenty-Seventh Annual Report of the Interstate Commerce Commission, dated December 15, 1913, recommended that the provisions of section 20 relating to the compulsory production of papers and records of the carriers be further amended. The report noted:

Another particular in which the year's experience demonstrates that the terms of the act need to be made more certain, relates to the language of section 20 requiring carriers to give representatives of the Commission access to their "accounts, records, and memoranda." While carriers generally have shown a commendable frankness in exhibiting all of their files to the agents of the Commission, there have recently been instances where a carrier has refused access to certain of its correspondence files on the ground that they were not proper-

---

4. With respect to the amendment of section 20 the Report states in part:

Section 7 is an amendment of section 20 of the act of 1887, and gives the Commission additional power with regard to reports from all common carriers, subject to the law, and to prescribe the manner in which such reports shall be made and the subject-matter of the report, and provides a penalty for failure

to obey such requirements. It also gives the Commission power, in its discretion, to prescribe the form of accounts, records, and memoranda to be kept by carriers, and that the Commission shall at all times have access to *such* records and books and other accounts to be kept. H.R.Rep. No. 591, 59th Cong., 1st Sess. 5–6 (1906) (emphasis supplied).

ly to be considered as "accounts, records, or memoranda." The work of detecting and prosecuting many of the ingenious devices for rebating and otherwise violating the law has been greatly facilitated in the past by the fact that representatives of the Commission were authorized to examine the correspondence relating to questionable transactions which was to be found in the files of the carriers. * * * For this reason additional legislation making explicit and certain the authority of the Commission to examine all correspondence files, indexes, and other papers and documents retained by carriers subject to the act is desirable if the many violations of the act which can be disclosed only by access to these papers are to be effectually discouraged. Twenty-Seventh Annual Report of the Interstate Commerce Commission 13–14 (1913).

This recommendation was repeated in the Twenty-Eighth Annual Report of the Interstate Commerce Commission, Part I, 65 (1914).

It is plain that the purpose of the Commission in recommending this amendment was only to gain access to correspondence relating to violations of the Act by carriers; it was not intended to permit the examination of correspondence of every nature.

On February 23, 1915 the Supreme Court held that the authority of the Commission under section 20 to examine the accounts, records and memoranda of carriers did not extend to the correspondence sent to or received by the railroads. United States v. Louisville & Nashville Railroad Company, 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915). The Court confined the Commission's power of compulsory inspection to narrow limits, saying:

There is nothing from the beginning to the end of the section to indicate that Congress had in mind that it was making any provisions concerning the correspondence received or sent by the railroad companies. The primary object to be accomplished was to establish a uniform system of accounting and bookkeeping, and to have an inspection thereof. If it intended to permit the Commission to authorize examiners to seize and examine all correspondence of every nature, Congress would have used language adequate to that purpose. A sweeping provision of that nature, attended with such consequences, would not be likely to have been enacted without probable exceptions as to some lines of correspondence required to be kept open and subject to inspection upon demand of the agents of the government. 236 U.S. at 335–36, 35 S.Ct. at 369.

The Court noted that a broad construction of section 20 might include confidential correspondence between a railroad and its counsel, and might raise constitutional questions; but, said the Court:

How far such a demand as embodied in this petition can be permitted within the constitutional rights set up by the defendant, we do not need to consider, as we do not think that the section of the act of Congress under which the demand was made authorizes the compulsory submission of the correspondence of the company to inspection. It is true that correspondence may contain a record, and it may be the only record of business transactions, but that fact does not authorize a judicial interpretation of this statute which shall include a right to inspection which Congress did not intend to authorize. 236 U.S. at 336, 35 S.Ct. at 369.

The L & N decision demonstrates the Court's reluctance to extend the investigatory power of the Commission beyond the limits fixed by a narrow reading of the statute. 236 U.S. at 334, 35 S.Ct. 363. The Court held that the purpose of section 20 was to establish a uniform system of accounting and bookkeeping, not to grant unlimited power of inspection to the Commission.

Responding to the decision in the *L & N* case Congress in the Transportation Act of 1920, 41 Stat. 456 (1920), amended section 20 to read:

> The Commission shall at all times have access to all accounts, records, and memoranda, including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by carriers subject to this Act. . . . 41 Stat. 493 (1920).

The House Report accompanying the bill (H.R.Rep.No.456, 66th Cong., 1st Sess. 30) explained that section 20 was amended:

> so as to include, within the provisions relating to the keeping of accounts and the prohibition against destroying or mutilating them, all documents, papers, and correspondence required to be kept by the carriers. This amendment is necessary in view of the decision of the Supreme Court that existing law does not authorize the commission to examine correspondence.

▮ Although the amendment of 1920 brought certain materials within the reach of the Commission, it did not alter the basic design and purpose of section 20 as interpreted by the Supreme Court. The investigatory powers exercised by the Commission under that section were still required to relate to the maintenance of a uniform system of accounts, and to the explanation or understanding of required accounting entries.

▮ The Transportation Act of 1940, 54 Stat. 917 (1940), once again amended the relevant language of section 20 as follows:

> The Commission or any duly authorized special agent, accountant, or examiner thereof shall at all times have authority to inspect and copy any and all accounts, books, records, memoranda, correspondence, and other documents, of such carriers and lessors, and such accounts, books, records, memoranda, correspondence, and other documents, of any person controlling, controlled by, or under common control with any such carrier, as the Commission deems relevant to such person's relation to or transactions with such carrier.

This provision is phrased in more sweeping terms than its 1920 counterpart, but we think it was not intended materially to broaden the Commission's investigatory power which had existed under the 1920 version of the statute. Rather, the motivation for amending the section in 1940 was to permit the Commission to inspect and copy accounts, records, and explanatory materials of controlling, controlled, or jointly controlling persons in a manner similar to the inspection afforded in the case of regulated carriers. H.R.Rep.No.2016, 76th Cong., 3rd Sess. 67 (1940);[5] H.R.Rep. No.2832, 76th Cong., 3rd Sess. 73 (1940) (Conference Report). The amendment did not alter the limited function and purpose of section 20 as defined by previous statutes and by the Supreme Court.

▮ From this analysis of the history of section 20 we conclude that the Supreme Court's narrow construction of the purpose of the section is still controlling despite the 1920 and 1940 amendments. That purpose is to maintain a uniform accounting system and to permit the analysis and interpretation of records which are required to be kept by carriers. The Commission's access to memoranda and other materials in the

---

5. H.R.Rep. No. 2016, 76th Cong., 3rd Sess. 67 (1940), states:

The conference substitute amends section 20 of the Interstate Commerce Act which relates to accounts, records, reports, etc., of carriers subject to part I. The principal change is that which gives the Commission or its agents authority to inspect and copy accounts, books, records, memoranda, correspondence, and other documents of any person controlling, controlled by, or under common control with any such carrier, as the Commission deems relevant to such person's relation to or transactions with such carriers.

possession of carriers must therefore be confined to circumstances in which the need for information relating to or explanatory of required accounting and bookkeeping entries is evident. The Commission's powers of inspection are focused upon facts and historical data as reflected in the records; they do not extend to projections or predictions of future events which have no apparent relevance to the understanding or evaluation of accounting and bookkeeping entries. The budget and income forecasts demanded by the Commission here relate to events which might or might not occur in the future, as distinguished from facts and past events recorded in the books and records of the carriers. Such prognostications are not within the limited scope of the Commission's power of inspection under section 20. Accordingly, the judgment of the district court is

Affirmed.

### On Appellants' Suggestion for Rehearing En Banc

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of appellants' suggestion for rehearing en banc, it is

Ordered by the Court en banc that the aforesaid suggestion is denied.

Circuit Judge McGOWAN took no part in the consideration or disposition of the suggestion for rehearing en banc.

Statement of Circuit Judge LEVENTHAL, in which Chief Judge BAZELON, and Circuit Judges J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III, join, as to Why He Would Grant Suggestion for Rehearing En Banc.

The suggestion of the Interstate Commerce Commission (ICC) for rehearing en banc fails because not favored by five active judges. One judge is not voting. This is a memorandum of the view of four judges that the panel decision should be vacated and the matter subjected to further review.

Looking at the question broadly and prima facie, it seems to us likely that the ICC has authority to conduct an investigation when railroads are paying out dividends in excess of current earnings, and to examine the carriers' income and cash flow forecasts—at least where, as here, there is a context of proposals under consideration for legislation to make available loan guarantees to the railroad industry as one beset by financial strains.[1] We do not say that the authority may be exercised routinely, The items involved are internal papers that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items. That is, however, a reason for limiting the occasion of such production—by agency or judicial limitation—and for forbidding its disclosure outside the agency except under careful conditions subject to court review. It is not a basis for a decision finding the ICC totally without power to call for and study such critical documents.

1. On July 17, 1970, subsequent to a Senate Committee hearing, the ICC requested forecasts from 73 major railroads; 37 roads furnished the requested information; the others did not. In August 1970, it became public that Burlington had continued its dividend of $8,615,000 in the second quarter, as in the first quarter, notwithstanding a substantial loss in the first quarter, the first in 10 years, and earnings in the second quarter of only $4,547,000. The September 4, 1970, letter of the Director of ICC's Bureau of Accounts noted his concern over the adverse impact of the dividend declarations on the company's working capital and cash position, and made the request for information identified in the panel opinion, including a request for the company's "plans to pay debt obligations coming due." The Company expressly declined to furnish forecasts of income and cash flow, and transmitted opinion of counsel that the company was not required to furnish such information to the ICC.

Hence a question may have to be faced as to whether and to what extent such information may be required for the purpose of transmittal to a legislative committee. However, it is in general a factor supporting latitude of investigation by a regulatory commission that it is intended to add flexibility to the implementation of legislative policy, and to make investigations of abuses and problems that may call in part for use of existing administrative authority and in part for new legislation.

Looking at the question as a technical issue of statutory construction, we note that the panel relies on Justice Day's opinion in United States v. Louisville & Nashville R. Co., 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915), as giving a narrow reading to § 20(5) of the Interstate Commerce Act, as added by the 1906 Hepburn Act. The Court held that there was no right to demand production of correspondence.

We have these comments: (1) The 1915 interpretation served to avoid constitutional doubts presented by the Court's then views as to the extent of the protection of the Fourth Amendment against compulsory production of corporate documents. See FTC v. Am. Tobacco, 264 U.S. 298, 306, 44 S.Ct. 336, 68 L.Ed. 696 (1924) ("fishing expeditions"). But those constitutional doubts no longer exist. See United States v. Morton Salt, 338 U.S. 632, 637, 70 S.Ct. 357, 94 L.Ed. 401 (1950). The removal of the constitutional doubts opens up the propriety of the interpretation of the statute in accordance with its terms. This point was not only noted in this court's opinion in Montship Lines Ltd. v. FMB, 111 U.S.App.D.C. 160, 295 F.2d 147 (1961), but was developed last Term in Griffin v. Breckenridge, 403 U.S. 88, 95–96, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), where Justice Stewart wrote for a unanimous Court in reversing the restrictive interpretation given 42 U.S.C. § 1985(3) in 1951, that it reached only conspiracies under color of state law. In 1971 Justice Stewart wrote that since the constitutional problems that concerned the Court in 1951 had been dissipated by subsequent opinions, there was no reason to deny the words of the statute their apparent meaning as applicable to all conspiracies, including private conspiracies, to deprive persons of their Federal rights.

(2) Congress specifically rejected the 1915 *Louisville & Nashville* decision in the 1920 amendment of § 20, which spells out that the ICC right of access "to all accounts, records, and memoranda" includes "all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept by carriers subject to this Act."

As to "correspondence," this plainly undercuts Justice Day's reliance that the Hepburn Act wording had not gone so far as to refer expressly to "correspondence."

More important for present purposes, the 1920 wording makes clear that § 20 governs documents that are "kept" whether or not "required to be kept." This is significant in view of Justice Day's comment that the Hepburn Act's purpose was to allow the ICC to prescribe the forms of accounts, record, and memoranda to be kept by carriers, which it is given access at all times, after which he added: "The railroads are not allowed to keep any other than those prescribed by the Commission." 236 U.S. at 333, 35 S.Ct. at 368. And he noted that the ICC was surely not authorized to prescribe the forms of correspondence, see 236 U.S. at 334, 35 S.Ct. 363.

The change in wording to cover memoranda including documents and correspondence actually kept whether or not required to be kept was part of the Transportation Act of 1920, a thoroughgoing revision of the ICC laws which expanded enormously the responsibilities of the ICC for the integrity and balance of the transportation system.

(3) Finally, it is not certain whether the *Louisville & Nashville* opinion, in prohibiting compulsory production of correspondence, necessarily prohibits compulsory production of earning fore-

cast memoranda. The Court reserved the possibility that the Hepburn Act was broad enough to authorize an inspection of accounts, records and memoranda for which no form has been prescribed by the Commission (236 U.S. at 334, 35 S.Ct. 363).

\* \* \*

The question is important, and the panel decision is so doubtful that we think it should be vacated and reconsidered en banc.