**CIVIL AERONAUTICS BOARD,**
**Plaintiff-Appellant,**

v.

**UNITED AIRLINES, INC.,**
**Defendant-Appellee.**

No. 75–2116.

United States Court of Appeals,
Seventh Circuit.

Argued April 14, 1976.

Decided Sept. 23, 1976.

Samuel K. Skinner, U. S. Atty., Chicago, Ill., Ronald R. Glancz, Dept. of Justice, Civ. Div., App. Section, Washington, D. C., Thomas F. McBride, Washington, D. C., for plaintiff-appellant.

H. Templeton Brown, Chicago, Ill., for defendant-appellee.

Before HASTINGS, Senior Circuit Judge, TONE, Circuit Judge, and NOLAND, District Judge.*

TONE, Circuit Judge.

In this appeal by the Civil Aeronautics Board we must decide whether § 407(e) of the Federal Aviation Act of 1958, as amended, 49 U.S.C. § 1377(e) (Supp. V, 1975), gives the Board inspection powers equivalent to a continuing general search warrant, as the Board contends. We hold that there are limits to the Board's inspection powers, and affirm the summary judgment entered by the District Court against the Board. 399 F.Supp. 1324 (N.D.Ill.1975).

The Federal Aviation Act of 1958, 49 U.S.C. § 1301, *et seq.*, entrusts the Board with economic regulation of air carriers. In April 1975, authorized agents of the Board presented themselves at defendant United Airlines, Inc.'s executive offices in Elk Grove, Illinois, and requested immediate access to all records and documents located on the premises. This initial request was subsequently limited to include, for six different departments, United's: (1) reading files, which contain copies of all correspondence arranged in chronological order, (2) subject matter files, which contain correspondence, memoranda, studies, reports, etc., dealing with specific matters, (3) expense reports, which United has since agreed to provide, and (4) memoranda. The agents refused to disclose the subject of their investigation. When asked whether it was possible political campaign contributions, they said their investigation might include, but was not limited to, that subject. Eventually United offered to make available its records pertaining to political contributions, if that were the Board's area of interest, "as well as any other records specifically identified and pertinent to" the Board's investigation. It refused, however, the Board's request for plenary access to its files. Three days later the Board filed this suit seeking, pursuant to 49 U.S.C. § 1487 and 28 U.S.C. § 1345, to enjoin United's refusal to allow CAB agents "immediate and unconditional access to all lands, buildings and equipment of United, and accounts, memoranda, correspondence, records, reports and documents kept" by the carrier. The District Court, Judge Richard W. McLaren, granted United's motion for summary judgment.

Despite the unlimited inspection sought in the complaint, the District Court treated the Board's demand as limited to the records listed above, and those are the records the Board seeks before us. The Board's demand was further limited in this court to exclude records protected by the attorney-client privilege and certain files maintained by employees on United's premises but not relating to United's business and therefore actually not a part of Unit-

* The Honorable James E. Noland, United States District Judge for the Southern District of Indiana, is sitting by designation.

ed's records.[1]  None of these limitations, however, change the nature of the issue before us.  The Board continues to claim the right to search several broad categories of the carrier's records without specifying a purpose and indeed without having any purpose, and it grounds this claim on the proposition that it is entitled to unlimited access to all the carrier's records, with the possible exception of documents subject to the attorney-client privilege.

### 1.

Section 407(e) of the Federal Aviation Act, 49 U.S.C. § 1377(e) (Supp. V, 1975), which the Board contends gives it unlimited inspection authority, provides as follows:

> "The Board shall at all times have access to all lands, buildings, and equipment of any air carrier or foreign air carrier and to all accounts, records, and memorandums, including all documents, papers, and correspondence, now or hereafter existing, and kept or required to be kept by air carriers, foreign air carriers, or ticket agents and it may employ special agents or auditors, who shall have authority under the orders of the Board to inspect and examine any and all such lands, buildings, equipment, accounts, records, and memorandums.  .  .  ."

Accounts, records, and memorandums "required to be kept," as well as those which may be "kept," are provided for in § 407(d), 49 U.S.C. § 1377(d), which states as follows:

> "The Board shall prescribe the forms of any and all accounts, records, and memoranda to be kept by air carriers, including the accounts, records, and memoranda of the movement of traffic, as well as of the receipts and expenditures of money, and the length of time such accounts, records, and memoranda shall be preserved; and it shall be unlawful for air carriers to keep any accounts, records, or memoranda other than those prescribed or approved by the Board: *Provided,* That any

air carrier may keep additional accounts, records, or memoranda, if they do not impair the integrity of the accounts, records, or memoranda prescribed or approved by the Board and do not constitute an undue financial burden on such air carrier."

In contrast to the Board's claim of plenary inspection authority, United's position is that the Board may inspect only those records which it has "required to be kept" and records voluntarily "kept" which support, explain, or relate to those required to be kept.  This was the interpretation of the statute adopted by the District Court.  399 F.Supp. at 1328.

### 2.

The District Court's holding is supported by *Burlington Northern, Inc. v. Interstate Commerce Commission,* 149 U.S.App.D.C. 176, 462 F.2d 280, 287–288, *rehearing en banc denied by an equally divided court, cert. denied,* 409 U.S. 891, 93 S.Ct. 120, 34 L.Ed.2d 148 (1972).  The narrow issue before the court in that case was whether the Commission could inspect the carrier's earnings forecasts.  These documents were demanded by the Commission in connection with a request made to it by a Senate Subcommittee for financial forecasts of railroads that were "marginal and losing money" and thus candidates for loan guarantees.  Although the Burlington Northern was not claimed to be "marginal" or "losing money," the panel did not rest its decision on the ground that the inquiry was not relevant to the investigative purpose, but on a narrow interpretation of the governing statute, § 20(5) of the Interstate Commerce Act, as amended, 49 U.S.C. § 20(5), which served as the model for the provisions of the Federal Aviation Act now before us.  This interpretation was based upon the history of § 20, particularly its interpretation by the Supreme Court in *United States v.*

---

1.  Documents relating to national security affairs were claimed to be privileged by United in the District Court but were not the subject of argument before us.  The District Court held that only the government could assert such a claim and that if national security claims were made the interested government agencies should resolve the issues raised.  See 399 F.Supp. at 1326 n. 8.

*Louisville & Nashville R.R.,* 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598 (1915). In the *Louisville & Nashville* case the Court held that the grant to the Interstate Commerce Commission of authority to inspect accounts, records, and memoranda did not include the right to inspect correspondence. The right to inspection, reasoned the Court, was related to the purpose of § 20, which was to establish a uniform and reliable system of accounting. *Id.* at 335, 35 S.Ct. 363. If Congress had intended to authorize inspection of correspondence, it would have "used language adequate to that purpose" and would have excepted "some lines of correspondence," particularly that between the carrier and its attorneys. *Id.* at 336, 35 S.Ct. at 369. In *Burlington Northern,* the court pointed out that although Congress amended § 20 in 1920, ch. 91, 41 Stat. 456, 493, to include "correspondence" and other "documents" and "papers," thereby abrogating the specific holding of the *Louisville & Nashville* case,

> "it did not alter the basic design and purpose of section 20 as interpreted by the Supreme Court. The investigatory powers exercised by the Commission under that section were still required to relate to the maintenance of a uniform system of accounts, and to the explanation or understanding of required accounting entries." 462 F.2d at 287.

Nor, said the court, did this basic design of § 20 change, so far as carriers were concerned, with the amendment made by the Transportation Act of 1940, ch. 722, 54 Stat. 898, 917.[2] The court concluded from this history that its interpretation of § 20 should be governed by the Supreme Court's "narrow construction of the purpose of the section" in the *Louisiana & Nashville* case as being "to maintain a uniform accounting system and to permit the analysis and interpretation of records which are required to be kept by carriers." From this it followed that the Commission's access to the carrier's files was "confined to circumstances in which the need for information relating to

or explanatory of required accounting and bookkeeping entries is evident." 462 F.2d at 287–288.

Judge Leventhal's statement, for himself and three other judges, of why they would have ordered rehearing *en banc* in *Burlington Northern,* observed first that the interpretation of § 20 in *Louisville & Nashville* served to avoid a constitutional problem (concerning the extent of the protection afforded corporate documents by the Fourth Amendment) since laid to rest in *United States v. Morton Salt Co.,* 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401 (1950). He then argued that Congress' rejection of the *Louisville & Nashville* interpretation of § 20 in the 1920 amendments was broader in scope than the panel opinion indicated. Those amendments, he said, not only expressly include "all documents, papers, and correspondence" but, by the words "kept or required to be kept," made it clear that "§ 20 governs documents that are 'kept.'" 462 F.2d at 289.

Judge Leventhal's opinion did not, however, argue that the agency had the plenary inspection powers the Board claims for itself in the case at bar. On the contrary, the context in which the Commission's request was made was critical. The Commission, he said, probably

> "has authority to conduct an investigation when railroads are paying out dividends in excess of current earnings, and to examine the carriers' income and cash flow forecasts—at least where, as here, there is a context of proposals under consideration for legislation to make available loan guarantees to the railroad industry as one beset by financial strains. We do not say that the authority may be exercised routinely. The items involved are internal papers that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items. That is, however, a reason for limiting the occa-

---

**2.** The motivation for the 1940 amendment, the court said, was to extend the Commission's inspection powers to records of controlled, con-

trolling, or jointly controlling persons. 462 F.2d at 287.

sion of such production—by agency or judicial limitation—and for forbidding its disclosure outside the agency except under careful conditions subject to court review. It is not a basis for a decision finding the ICC totally without power to call for 'and study such critical documents." 462 F.2d at 288. (Footnote omitted.)

### 3.

The reservations expressed by Judge Leventhal in *Burlington Northern* appear to assume that a proper investigative purpose is an essential predicate of any investigative demand. This view is consistent with that expressed by the Supreme Court in *Morton Salt*, a case which sustained broad visitorial powers in the Federal Trade Commission:

"Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. *Federal Trade Comm'n v. American Tobacco Co.* [264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924).] But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant. 'The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.' *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 208 [66 S.Ct. 494, 90 L.Ed. 614]." 338 U.S. at 652–653, 70 S.Ct. at 369.

In *Oklahoma Press Publishing Co. v. Walling*, Mr. Justice Rutledge, speaking for the Court, recognized the need for some legitimate investigative purpose to which the production demand must be reasonably relevant and for reasonable definiteness in the demand. In harmonizing that holding with earlier decisions, he spoke of subpoenas that were so broad or indefinite as "to approach in this respect the character of a general warrant or writ of assistance, odi-

ous in both English and American history." 327 U.S. at 207, 66 S.Ct. at 505. Speaking of Mr. Justice Holmes' opinion in *Federal Trade Commission v. American Tobacco Co.*, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924), Mr. Justice Rutledge said that "the aggravating circumstance . . . seems to have been the Commission's claim of 'an unlimited right of access to the respondents' papers with reference to the possible existence of practices in violation of section 5.'" (The inner quotation is from 264 U.S. at 305, 44 S.Ct. 336.) 327 U.S. at 207 n. 40, 66 S.Ct. at 505. The *Oklahoma Press* opinion also quotes the condemnation in *American Tobacco*, 264 U.S. at 306, 44 S.Ct. at 337, of a demand to "search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up." *Id.* The demand in *American Tobacco* was also cited by the Court in *Morton Salt*, as an illustration of a demand so "sweeping" and so "unrelated to the matter properly under inquiry as to exceed the investigatory power." 338 U.S. at 652, 70 S.Ct. at 369. The Board's demand in the case at bar is virtually identical to that condemned in *American Tobacco*.

Also relevant is *California Bankers Association v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), in which the Court carefully pointed out that the challenged regulations "do not authorize indiscriminate rummaging among the records of the plaintiff," *id.* at 62, 94 S.Ct. at 1518, and that the information required to be reported "is sufficiently described and limited in nature . . . so as to withstand the Fourth Amendment challenge made by the bank plaintiffs." *Id.* at 67, 94 S.Ct. at 1520.

The recognition in *Morton Salt* and *Oklahoma Press* of a requirement that an inspection demand be reasonably definite and reasonably relevant to a proper investigative purpose was not based on the Fourth Amendment. The question of whether that amendment applied to corporations was reserved.[3] Later decisions establish that it does. *California Bankers Association v.*

---

**3.** But *cf. Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed.

319 (1920), cited in *Oklahoma Press*, 327 U.S. at 206, n. 35, 66 S.Ct. 494.

*Shultz, supra,* 416 U.S. at 60–63, 66–67, 94 S.Ct. 1494; *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Compare *Burlington Northern, supra,* 462 F.2d at 289 (separate opinion of Leventhal, J.). The Board does not contend otherwise. Its position is that the Fourth Amendment protects one's expectation of privacy, *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), that a corporation has less expectation of privacy than an individual, *United States v. Morton Salt Co., supra,* 338 U.S. at 652, 70 S.Ct. 357, and that a regulated carrier has even less; therefore, argues the Board, it is not unreasonable for the Board to have unlimited power to inspect carrier records. The Board reasons that the carrier is in the same position as a regulated liquor dealer, *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), or gun dealer, *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

We think that "the evils at hand," *Colonnade Catering Corp. v. United States, supra,* 397 U.S. at 76, 90 S.Ct. 774, in the liquor and gun trades are not sufficiently analogous to the problems which are likely to arise in a public transportation industry to justify reliance here on cases dealing with those trades. And, while the expectation of privacy of a regulated carrier is limited, it nevertheless exists. As Judge Leventhal said in the passage quoted above, there are internal corporate papers "that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items [which is] a reason for limiting the occasion of [their] production . . . ." *Burlington Northern, supra,* 462 F.2d at 288. We need not define the limitations the Fourth Amendment places on investigatory power in order to decide this case, but Judge McLaren's observation that "a court should not construe a statute in such a manner as to raise a serious constitutional issue," 399 F.Supp. at 1328, is not irrelevant.

In summary, the decisions uniformly require that an investigative demand be reasonably definite and reasonably relevant to some proper investigative purpose. The Board cites no case, and we have found none, holding that any statute has conferred a general warrant power on any agency. Such a statute would at least raise serious problems under the Fourth Amendment. With this background, we turn to the statute before us.

4.

The Board relies on the "plain meaning" of § 407(e) and argues that the word "all" should not be construed to mean "some." Compare *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976). United, on the other hand, urges that we consider § 407(e) in light of the statute as a whole and its legislative history. Although we differ with United in the conclusions reached, we think this is the proper approach. The Supreme Court has recently said:

> "When 'interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give to it such a construction as will carry into execution the will of the Legislature. . . .'" *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974), quoting *Brown v. Duchesne,* 19 How. (60 U.S.) 183, 194, 15 L.Ed. 595 (1857).

See also *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *United States v. American Trucking Associations, Inc.,* 310 U.S. 534, 542–544, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The purpose of § 407(e), situated as it is in the midst of an enumeration of CAB's economic regulatory powers, appears to be to allow the Board to obtain information on which to base the exercise of its broad, though not unlimited, powers. In view of this apparent purpose

and the considerations discussed in Part 3, *supra,* we are not inclined to accept the Board's interpretation of the statute as conferring the authority of a general warrant in the absence of legislative history showing that Congress intended that result or a showing that such authority is essential to the exercise of the Board's regulatory functions.

Title IV of the Federal Aviation Act of 1958, 49 U.S.C. §§ 1371–1387, which contains § 407, was a "reenactment, virtually without substantive change," of Title IV of the Civil Aeronautics Act of 1938, as amended. H.R.Report No. 2360, 85th Cong., 2d Sess. 15, 1958 *U.S.Code Cong. & Admin.News* at 3741. Subsections 407(d) and (e), except for the name of the regulating agency, were, in fact, identical to subsections 407(d) and (e) of the 1938 Act.[4] These provisions were, as we have said, based upon § 20(5) of the Interstate Commerce Act, as amended, which first appeared as a part of the Hepburn Act of 1906, ch. 3591, 34 Stat. 584, 594,[5] and were amended in 1920.[6]

The Civil Aeronautics Act of 1938 was over four years in the making. See C.

Rhyne, *The Civil Aeronautics Act Annotated* 189 (1939). The only relevant discussion of access to carrier records which we have found occurred in the 1935 hearings at a time when the then current version of the bill would have made it unlawful for a carrier to keep any records not prescribed or approved by the regulatory agency. A number of airline representatives expressed concern about their ability to retain "certain operating, statistical, and other information not required by the Commission."[7] Hearings on S. 3027, before a Subcommittee of the Senate Committee on Interstate Commerce, 74th Cong., 1st Sess. 42 (Wright testimony); see also Hearings, *id.,* at 51 (Smith testimony); Hearings, *id.,* at 59 (Putnam testimony). Apparently as a result of this concern, the proviso permitting additional records was added to § 407(d). Several of the airline representatives, in the course of this testimony, stated that all additional records would be available for inspection. The Board seizes on this testimony as indicating that the regulatory agency was understood to have plenary access to all papers and documents. We do not attach such significance to these re-

---

**4.** As discussed later in the text, the 1975 amendments to § 407(e) extended the Board's authority to cover foreign air carriers and ticket agents. The other changes made by the amendments were of form only.

**5.** That Act gave the Commission significant powers to regulate railroad freight rates. While the congressional hearings, debates, and reports on the bill were extensive, little attention was given to the addition of § 20(5). H.R. Report No. 591, 59th Cong., 1st Sess. 5–6 (1906), explained only that ICC had been given the power "to prescribe the form of accounts, records, and memoranda to be kept," and "access to such records and books" at all times. Other explanations referred to this and several other provisions as "mere matters of detail," 40 Cong.Rec. 1954 (Feb. 2, 1906) (remarks of Congressman Thomas), or, although important, as "subordinate" to the other sections, 40 Cong. Rec. 2082 (Feb. 5, 1906) (remarks of Congressman Stevens).

**6.** The 1920 amendment added the language "including all documents, papers, and correspondence now or hereafter existing, and kept or required to be kept" to the description of materials to which ICC was given access. Although this addition was prompted by the Supreme

Court's *Louisville & Nashville* decision, *supra,* see H.R.Report No. 456, 66th Cong., 1st Sess. 30 (1919), earlier versions of the bill were favorably reported out of committee as early as 1914. These would have given ICC authority to inspect "any and all . . . accounts, records, memoranda, correspondence, documents, and papers [prescribed or approved by the commission] . . . ." H.R. 16585, 63d Cong., 2d Sess. at 9 (1914); see also the bill as originally introduced by Representative Rayburn, H.R. 16133, 63d Cong., 2d Sess. at 9 (1914). In addition, the Commission would have been empowered to examine the "books, papers, and correspondence of carriers, construction or other companies, or of firms or individuals with which a carrier shall have had financial transactions." H.R. 16586, 63d Cong., 2d Sess. at 8 (1914); see also H.R. 16133, 63d Cong., 2d Sess. at 8 (1914).

**7.** The reference is to the Interstate Commerce Commission, to which the bill as originally introduced gave the regulatory authority over airlines. The final version gave the authority to the newly created Civil Aeronautics Authority.

marks. They indicate that the speakers thought the additional records they wanted to keep, which concerned carrier operations, would be available for inspection, but the conditions of the inspection were not discussed.

The Board also contends that a 1975 amendment to § 407(e) "reaffirms" Congress' intent that the Board have plenary access to carrier files. That amendment added to the Board's existing authority over domestic carriers under § 407(e) its present authority over foreign air carriers and ticket agents. International Air Transportation Fair Competitive Practices Act of 1974, Pub.L. No. 93–623, 88 Stat. 2102, 2105. Because § 407 nowhere authorizes the Board to require that records be kept by foreign air carriers or ticket agents, United's argument that inspections should be limited to required and related records is significantly weakened. An examination of the purpose of the amendment does not, however, lead us to accept the Board's position. That purpose was to provide the Board with a means to detect illegal rebates and charges by ticket agents at other than the posted tariff rate. See H.R.Rep. No. 93–1475, 93d Cong., 2d Sess., 1974 *U.S.Code Cong. & Admin.News* pp. 7461, 7466–7467. Corresponding changes were made in § 403(b), 49 U.S.C. § 1373(b) (Supp. V, 1975), which regulates the observance of tariffs and granting of rebates. These changes are consistent with the view that the purpose of § 407(e) was to give the agency access to all documents and materials which further a valid regulatory function. They do not suggest that a general-warrant power was intended.

■ Turning to the question of whether a plenary inspection authority is essential to the Board's regulatory functions, we note that the Board's regulatory authority is not plenary. Under Title III of the 1958 Act, for example, the power to prescribe regulations governing the use of navigable airspace is vested in the Federal Aviation

Administrator,[8] see 49 U.S.C. § 1348. Also, the CAB's Title VII rulemaking and investigative responsibilities relating to accidents were transferred to the National Transportation Safety Board by § 6 of the Department of Transportation Act of 1966, 49 U.S.C. § 1655(d). Similarly, the CAB has no general authority to regulate personnel policies or affiliate relationships, although some of these matters, such as the setting of reasonable rates, mergers with and acquisitions of other carriers, and interlocking relationships, may have an impact on areas subject to CAB regulation. See 49 U.S.C. §§ 1373, 1374, 1376, 1378, 1379, 1482.

■ We find nothing in the legislative history, the scheme of the Act, or the regulatory powers which are to be aided by the inspection power to support the view that Congress intended the Board to have the plenary inspection powers it claims. In light of this, and of the judicial precedents discussed earlier in this opinion, § 407(e) should not be read to confer on the Board the claimed investigative powers equivalent to a perpetual general warrant.

### 5.

■ While the Board's inspection powers are not plenary, we believe they are not limited, as United contends and the District Court concluded, to the inspection of records required to be kept and records related to those required to be kept. Judicial views of the proper scope of the administrative visitorial function have changed and developed since the Supreme Court's decision in the *Louisville & Nashville* case, as evidenced by *Morton Salt* and *Oklahoma Press*, discussed in Part 3, above, and Mr. Justice Clark's recent opinion for this court in *American International Trading Co. v. Bagley*, 536 F.2d 1196 (7th Cir. 1976). *Cf.* also, Judge Leventhal's opinion favoring rehearing *en banc* in *Burlington Northern, supra,* 462 F.2d at 289. We believe that, in adopting § 407(e), Congress intended to give the Board power to investigate any

8. The Department of Transportation Act, cited below in the text, transferred the Administrator from the Federal Aviation Agency to the Department of Transportation. 49 U.S.C. § 1655(c).

subject properly within its jurisdiction and to inspect any carrier records reasonably relevant to such an investigation.[9] There are no doubts based on the Fourth Amendment that would justify construing the statute to deny the power. *See, e. g., Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 216–217, 66 S.Ct. 494, 90 L.Ed. 614 (1946); *Equal Employment Opportunity Commission v. University of New Mexico,* 504 F.2d 1296, 1299–1300, 1302–1303 (10th Cir. 1974); see also *United States v. Morton Salt Co.,* 338 U.S. 632, 641–643, 70 S.Ct. 357, 94 L.Ed. 401 (1950). While, as United argues, a subpoena under § 1004(b) of the Act, 49 U.S.C. § 1484(b), and the regulations issued pursuant to that subsection,[10] would be available in aid of an investigation, relegating the Board to that procedure would result in delay and some loss of flexibility. The Board's interpretation of the statute and its own regulations are entitled to deference, *American Meat Institute v. EPA,* 526 F.2d 442, 449–452 (7th Cir. 1975); see *Northern Indiana Public Service Co. v. Porter County Chapter of Izaak Walton League of America,* 423 U.S. 12, 14–15, 96

S.Ct. 172, 46 L.Ed.2d 156 (1975), and we conclude that if a carrier's records are reasonably relevant to an investigation the Board is empowered to make, they may be inspected under § 407(e).

### 6.

■ Determining the relevancy of the documents sought is the agency's responsibility in the first instance. *Oklahoma Press Publishing Co. v. Walling, supra,* 327 U.S. at 214–216, 66 S.Ct. 494. Given the requirement that a demand be reasonably relevant to a proper investigative purpose, the Board must of course have such a purpose to make the necessary determination of relevance itself. Further, the Board must disclose its purpose to enable a court to make a determination of relevance. Otherwise no inquiry "into the underlying reasons for the examination", *United States v. Powell,* 379 U.S. 48, 58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964), is possible. This obligation is of course not satisfied by the recital that the purpose of the investigation is to determine compliance with the law. The same could be said for any general warrant. *Cf. Okla-*

**9.** For further light on the reasonably-relevant standard, see, in addition to the authorities discussed in Part 3, *supra, United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964) (holding that the Commissioner of Internal Revenue Service could enforce an administrative summons to produce tax records, upon a showing before the district court "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the [Internal Revenue] Code have been followed. . . ."); *Endicott Johnson Corp. v. Perkins,* 317 U.S. 501, 509, 63 S.Ct. 339, 87 L.Ed. 424 (1943); *SEC v. Brigadoon Scotch Distributing Co.,* 480 F.2d 1047, 1052–1055 (2d Cir. 1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974); see also *Federal Maritime Commission v. Port of Seattle,* 521 F.2d 431, 433–436 (9th Cir. 1975); *cf.* Fed.R.Civ.P. 26(b)(1).

**10.** 14 C.F.R. part 305, the regulation promulgated by CAB in 1963 implementing its subpoena-issuing authority, provides that it

"shall govern informal nonpublic investigations, as distinguished from formal investigations and adjudicatory proceedings, undertaken by the Bureau of Enforcement with a

view to obtaining information from any person." 14 C.F.R. § 305.1.

We are not told whether the agents who sought access to United's files were with the Bureau of Enforcement, but the complaint and stipulation of facts are both signed by a Bureau of Enforcement attorney, and it is difficult for us to characterize this investigation as anything other than "informal" and "nonpublic." On the other hand, 14 C.F.R. part 240, which implements CAB's inspection authority, provides in pertinent part:

"Upon the demand of a special agent or auditor of the Board, and upon the presentation of the identification card and credentials issued to him . . . any air carrier. . . shall forthwith permit such special agent or auditor to inspect and examine . . . all accounts, records, memorandums, documents, papers and correspondence. . . ." 14 C.F.R. § 240.2.

Citing 28 Fed.Reg. 5989, 5990 (1963), the Board indicates that the primary purpose of part 305 was to provide a means for obtaining information from persons who are not subject to regulation under the Federal Aviation Act. This is not an unreasonable interpretation and it helps to explain the reason for the two express grants of investigative powers.

*homa Press Publishing Co. v. Walling, supra,* 327 U.S. at 207, n. 40, 66 S.Ct. 494.

■ In the case at bar the Board, having taken the position that it need not specify its investigative purpose or make its demand reasonably definite, and having demanded only the issuance of an order which would amount to a general warrant, made it impossible for the District Court to grant the less expansive relief to which the Board would have been entitled. That court's order denying relief is therefore affirmed.

AFFIRMED.