William P. TAVOULAREAS, et al.
v.
The WASHINGTON POST COMPANY, d/b/a the Washington Post, a Delaware Corporation, et al.

Appeal of MOBIL CORPORATION, et al.

No. 83–1688.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 27, 1983.

Decided Jan. 6, 1984.

Rehearings Denied March 15, 1984.

Rehearing En Banc Granted March 15, 1984.*

* Judgment and Opinion vacated.

See also 93 F.R.D. 24.

Loren Kieve, Washington, D.C., with whom Judah Best and George A. Birrell, Washington D.C., were on the brief, for appellants.

David E. Kendall, Washington, D.C., with whom Irving Younger, Kevin T. Baine, and Scott M. Matheson, Jr., Washington, D.C., were on the brief, for appellee The Washington Post Co.

Anthony C. Epstein, Washington, D.C., with whom Robert R. Bruce and Judy D. Lynch, Washington, D.C., were on the brief, for appellees The Reporters Committee for Freedom of the Press, et al.

Joseph A. Artabane, Washington, D.C., entered an appearance for appellee Tavoulareas.

H. Bartow Farr, III, Washington, D.C., entered an appearance for appellee Sandy Golden.

Before TAMM and WILKEY, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

Mobil Oil Corporation (Mobil) seeks reversal of the portion of a June 21, 1983 district court order that unsealed 3800 pages of deposition transcripts and 425 accompanying exhibits. The depositions and exhibits were initially designated confidential by Mobil pursuant to a "blanket" protective order issued on November 5, 1981. Mobil does not contest disclosure of the small portion of these depositions and exhibits that was used at trial.[1] It vigorously contests,

---

1. Throughout the briefing of this appeal, Mobil Oil Corporation (Mobil) and The Washington Post Co. (the Post) occasionally disagreed on the number of Mobil's confidential depositions and accompanying exhibits that had been used at trial. Brief for Appellee at 15–16 n. 16; Reply Brief for Appellant at 14 n. 6. Mobil notes that assuming *arguendo* the accuracy of the Post's references, only 385 of the 3800 pages of sealed depositions were read into the record, and 32 of the 425 deposition exhibits were used in some fashion in the case. Reply Brief for Appellant at 14 n. 6. The district court order appealed from found only that "a small percentage of [the depositions and exhibits] were actually used at trial." *Tavoulareas v. The Washington Post Co.,* No. 80–3032 at 4. (D.D.C. June 21, 1983).

however, disclosure of those documents not used at trial.[2] Brief for Appellant at 2. Because we find constitutionally protected privacy interests in Mobil's confidential commercial information not used at trial and no overriding reason to disclose this information, we reverse the appealed portion of the district court's June 21, 1983 order. We remand with instructions to reinstate the seal on those depositions and exhibits designated confidential but never used at trial.[3]

## I. Background

This dispute arises out of a libel action brought by Mr. William Tavoulareas, president of Mobil, and Mr. Peter Tavoulareas, his son, against The Washington Post Company (the Post). The libel claim was based on two articles published by the Post on November 30 and December 1, 1979. Each stated essentially that Peter Tavoulareas's ownership interest in Atlas Maritime Company and Mobil's extensive business transactions with Atlas were a result of nepotism. Record Excerpts (R.E.) at 531.[4] The Post served broad discovery requests on Mobil, initially a nonparty, while defending the lawsuit.[5]

In response to the Post's discovery requests, Mobil moved for a protective order securing the confidentiality of commercial information sought by the Post. R.E. at 2, 10–13. Mobil filed an affidavit by Mr. Walter E. MacDonald, a vice president in charge of Mobil's international marine transportation activities, in support of its motion for the protective order. R.E. at 144. Mr. MacDonald attested that protection of the materials sought by the Post "is essential not only to avoid impairing the competitive position of Mobil and to afford it reasonable protection against disclosure of proprietary and confidential business information, but also to minimize the possibility of impairing Mobil's relationship with the Government of the Kingdom of Saudi Arabia . . . ." R.E. at 145.

More specifically, Mr. MacDonald described the business relationships among Mobil, a Saudi Arabian marine company called Samarco, and the London-based Atlas Marine Company. He explained that the negotiation and implementation of business arrangements among these three companies revealed Mobil's strategy in maintaining access to substantial volumes of crude oil from Saudi Arabia. R.E. at 147. Mr. MacDonald also stressed the importance of keeping confidential "a company's vessel operating costs and investment return, its internal decision-making and financial analysis procedures regarding the chartering

---

On remand, the district court must determine which depositions and exhibits were used at trial. Mobil concedes that the seal should remain lifted from those depositions and exhibits that were used at trial, and we have determined that the seal should be reinstated on those that were not used at trial.

2. All the depositions and exhibits unsealed by the June 21 order had been filed with the district court, though the vast majority were not used at trial. Depositions and exhibits "not used at trial," for the purposes of this opinion, are those never submitted into evidence, read into the record, or submitted in support of a pretrial motion.

3. Hereinafter, this opinion will refer only to "the depositions" or "the depositions in dispute." This reference includes both the depositions and their accompanying exhibits, but only those documents not used at trial.

4. On November 25, 1980, Messrs. William and Peter Tavoulareas filed a libel action against the Post and several individuals. On July 30, 1982, a jury found that the Post and two individuals were liable to William Tavoulareas for publication of the November 30, 1979 article. On May 2, 1983, the district court entered judgment notwithstanding the verdict in favor of the Post and the two individual defendants regarding the November 30, 1979 article. Mr. William Tavoulareas is currently appealing this judgment in a separate case (No. 83–1605). Brief for Appellee at 3.

5. Mobil originally was not a party to the libel action brought by the Tavoulareases. Mobil later moved to intervene to ensure the continued confidentiality of its commercial information. On December 15, 1981, the district court granted Mobil's motion to intervene. At the same time, the district court extended the November 5, 1981 protective order, see infra note 6, to cover Mobil's confidential documents in the possession of Peter Tavoulareas and of entities in which he has an interest. R.E. at 164–65.

... of tankers, and its economic criteria applicable to decisions for the purchase or sale of vessels." R.E. at 148. Mr. MacDonald then gave specific examples of how public disclosure of the kind of documents requested would harm Mobil's competitive position. R.E. at 148–50.

On November 5, 1981, the district court issued Mobil's proposed protective order.[6] With regard to the harm disclosure could bring to Mobil's competitive position, the court noted:

> Mobil has adequately specified the harm likely to result absent a protective order. As Mr. MacDonald attests, the public disclosure of many of these documents might undermine Mobil's relationship with the Kingdom of Saudi Arabia, hamper its ability to compete in the marine transportation business, and threaten its access to substantial volumes of crude oil from Saudi Arabia. Furthermore, many of the discovery requests appear likely to reveal confidential, internal Mobil documents dealing with strategy, negotiations, and long-range corporate planning. The conclusion is inescapable that public disclosure of these kind of sensitive corporate documents would cause Mobil competitive harm sufficient to warrant imposition of a protective order adequate in character and balanced to the needs of the parties.

*Tavoulareas v. Piro,* 93 F.R.D. 24, 29 (D.D. C.1981). The protective order permitted

---

**6.** The protective order states in pertinent part:

ORDERED that the following protective provisions be, and hereby are, imposed upon any discovery conducted by defendants in this action, whether this discovery is directed at a party to the litigation, at Mobil or any of its officers or directors, or at any other person:

1. Mobil shall have the right to designate as confidential any information or documents revealed or produced by it in connection with this action. In the event that Mobil does designate any information or document as confidential, the information or document shall be made available only to the named individual defendants in this litigation, [and] to the attorneys for the named defendants .... Any information or document designated as confidential shall not be made available to defendant *The Washington Post,* or to any officer, director, or employee of defendant, including in-house counsel, except as provided in this Protective Order.

\* \* \* \* \* \*

3. Any depositions taken in this action in which any information or document designated confidential is or may be disclosed or utilized shall be attended only by the deponent, by counsel of record for the parties, by counsel or designated representatives of Mobil, and by persons described in paragraph 1, above, who have executed the attestation set forth in paragraph 2, above. All information disclosed in, and any transcripts made of, such depositions shall be treated in accordance with the confidential restrictions set forth in this Protective Order. . . .

\* \* \* \* \* \*

7. Defendants' counsel shall ensure that all confidential materials, information, and documents covered by this Protective Order, together with any authorized summaries or copies, are returned to counsel for Mobil at the time the above-referenced civil action terminates.

\* \* \* \* \* \*

9. In the event that any counsel for the parties determines that any person other than those referred to in this Protective Order should be permitted to examine designated confidential material, documents, or information encompassed within this Protective Order, counsel shall confer with counsel for Mobil in an effort to resolve the matter. In the absence of agreement, counsel may apply to the Court for the person in issue to examine the confidential material, documents, or information, which application shall state with specificity the reasons justifying this examination.

\* \* \* \* \* \*

12. The use of any information, document, or material encompassed within and protected by the terms of this Protective Order shall be restricted to this proceeding and shall not be used by defendants or any other person (other than Mobil) described in paragraphs 1, 3 and 9, above, for any other purpose whatsoever, *provided,* however, that this Protective Order shall apply only to information, documents, or material produced pursuant to discovery conducted in this civil action. This Protective Order, therefore, shall not apply to information, documents, or material that is obtained by reporters for *The Washington Post* through channels or means other than through discovery conducted in this civil action.

*Tavoulareas v. Piro,* 93 F.R.D. 24, 33–35 (D.D. C.1981). The protective order was structured in accordance with this court's directions in *In re Halkin,* 598 F.2d 176, 196 n. 47 (D.C.Cir. 1979).

Mobil to designate confidential those documents that contained sensitive commercial information. *Id.* at 33. If the Post wished to contest a confidential designation, it could apply to the court specifying the documents it wanted to disseminate, *id.* at 29, 30 n. 4, and the reasons justifying dissemination. *Id.* at 35.

Pursuant to the November 5, 1981 protective order, Mobil forwarded thousands of documents to the Post. Mobil's corporate officials responded to questions in depositions revealing sensitive commercial information. All totalled, the Post took over 6000 pages of deposition transcript, 3800 of which were designated confidential by Mobil. After trial of the libel claim had been completed, Mobil moved on August 8, 1982 for the return of its confidential documents. On September 14, 1982, the Post moved to unseal all documents filed with the court, including the 3800 deposition pages here at issue.[7] The Post, however, did not identify which pages among the 3800 it wished to disseminate, or the specific reasons for objecting to Mobil's designation of the documents as confidential. R.E. at 255, 267–69. On May 18, 1983, the district court ordered Mobil to "more specifically inform the Court as to its justification for continuing to seal" the disputed depositions. R.E. at 202.

In response to the court's order, Mobil submitted on May 31, 1983 a second sworn statement of Walter E. MacDonald and several exhibits to demonstrate the continuing need for confidentiality of the depositions. R.E. at 203. Mr. MacDonald reaffirmed the confidential nature of Mobil's arrangements for transporting oil from Saudi Arabia. R.E. at 204. He again noted the impact that disclosing such information may have on Mobil's access to crude oil from Saudi Arabia.[8] R.E. at 204. He explained that Mobil's counsel "were instructed to designate as confidential any portion of a deposition where Mobil's confidential documents were used or where the subject of Mobil's proprietary business relations with its Saudi partners was brought up." R.E. at 208–09. Thus, while confidential designations were not assigned after a document-by-document examination, they were assigned according to a systematic method tailored to protect only sensitive material.

While Mr. MacDonald noted that he had been able to review only a few of the 3800 pages of depositions, he did attest that he was "generally familiar with the subject-matter of the documents ... as well as [with] the underlying transactions and their importance to Mobil." R.E. at 211. Mr. MacDonald assured the court that

> Mobil's documents and information relating to its involvement in Samarco and its other shipping business remain confidential today as internal, proprietary, competitive information. Mobil has taken considerable care to maintain this information as nonpublic, proprietary material
> . . . .
>
> Because Mobil is involved with these same persons [referred to in the depositions] today ... it is just as important that Mobil's internal deliberations and analyses (as well as its confidential communications with its partners) remain confidential and nonpublic. No business organization can function effectively in the business marketplace if its internal, competitive documents and information are made public.

R.E. at 211–12. Mobil attached to this affidavit an exhibit listing thirty-three deposi-

---

**7.** Not all documents filed with the court were used at trial. *See supra* notes 1, 2.

**8.** Mr. MacDonald attested:

Mobil continues to maintain its business relations with its Saudi partners, not only in Samarco, but in other business enterprises as well. As I underscored in the June 12 affidavit, the "[u]nwarranted disclosure of materials of this nature [i.e., the type involving confidential business information requested by and produced to the Washington Post Company in discovery]" has "the very real potential of impairing Mobil's ability to negotiate future joint arrangements and other commercial transactions with business interests in Saudi Arabia, and could adversely affect Mobil's ongoing relationships with its Saudi partners in a variety of ventures unrelated to the Samarco shipping venture."
R.E. at 204.

tions and the confidential and nonconfidential portions of each deposition transcript. R.E. at 222–23.

On June 21, 1983, the district court unsealed all 3800 pages of depositions. *Tavoulareas v. Washington Post Co.,* No. 80–3032 (D.D.C. June 21, 1983). While the court noted that Mobil would not "have had to conduct a page-by-page examination of the over 3800 pages of sealed deposition," it concluded that "[i]t is sufficient merely to state that the justification Mobil has provided is not specific enough to warrant the continued sealing of these documents." R.E. at 231–32. On June 23, 1983, Mobil appealed this order. We have jurisdiction under 28 U.S.C. § 1291 (1976).

After full consideration, we disagree with the district court's conclusion that Mobil's showing was insufficient to justify continued confidentiality of those depositions never used at trial. Our decision follows from a different view of the relevant statutory and constitutional interests from that of the district court. While we acknowledge that discovery is presumptively open under the Federal Rules of Civil Procedure, we believe that statutory, common law, and constitutional privacy interests require protecting the confidentiality of Mobil's sensitive commercial information. Public dissemination of confidential discovery materials not used at trial cannot be justified by a common law or constitutional right of access or by a first amendment right of free speech or free press.

## II. The Presumption of Openness

A statutory presumption of openness for discovery materials, even those not used

at trial, derives from the Federal Rules of Civil Procedure. The Federal Rules do not restrict the use of properly discovered materials. Rule 26(c) requires the proponent of confidentiality to show good cause to limit the amount, method, or use of discovery as well as the people who are present at discovery proceedings. Fed.R. Civ.P. 26(c).

Rule 5(d) requires that all papers served upon a party after the complaint, including depositions, be filed with the court unless the court orders otherwise. Fed.R.Civ.P. 5(d). The Advisory Committee intended this filing requirement to apply even to documents not used in the proceedings. Fed.R.Civ.P. 5(d), advisory committee note ("it often happens that no use is made of the materials after they are filed").[9] The Committee requires such a filing because these "materials are sometimes of interest to those who may have no access to them except by a requirement of filing, such as members of a class, litigants similarly situated, or the public generally." Fed.R.Civ.P. 5(d), advisory committee note.

Similarly, Rule 30(f)(1) requires that depositions be "promptly file[d] ... with the court in which the action is pending" unless otherwise ordered by the court. Fed.R. Civ.P. 30(f)(1). This filing requirement was added to Rule 30 in 1980, and the advisory committee note refers to the note to Rule 5(d) as an explanation of the amended provision. Simply stated, the Federal Rules of Civil Procedure and the advisory committee notes indicate that discovery proceedings are presumptively open unless otherwise ordered by the court.[10]

---

**9.** In 1978 the Advisory Committee proposed, because of storage costs, that discovery materials not be filed except upon order of the court or for use in the proceedings. Even if this amendment had been approved, the accompanying advisory committee note provided for access to discovered material by nonparties:

This amendment and amendments to the discovery rules permit the materials described to be retained by the parties unless and until they are used for some purpose in the action. But any party may request that designated materials be filed, and the court may require filing on its own motion. It is intended that

the court may order filing on its own motion at the request of a person who is not a party who desires access to public records, subject to the provisions of Rule 26(c).

Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure, 77 F.R.D. 613, 622–23 (1978).

**10.** Courts have been virtually unanimous in concluding that the Federal Rules of Civil Procedure presume open discovery. *See, e.g., National Polymer Products v. Borg-Warner Corp.,* 641 F.2d 418, 423 (6th Cir.1981) ("[t]he discovery rules themselves place no limits on

This presumption of openness for discovery materials not used at trial is grounded only in the Federal Rules and does not derive either from a common law or first amendment right of access. The common law right of access to public records and documents, including judicial records and documents, allows public supervision of governmental proceedings. This right of access should extend only so far as necessary to serve its supervisory purpose.[11] Judge Wisdom noted in *Wilk v. American Medical Ass'n*, 635 F.2d 1295 (7th Cir.1980), that "[i]f the purpose of the common law right of access is to check judicial abuses, then that right should only extend to materials upon which a judicial decision is based." *Id.* at 1299 n. 7 (citations omitted).

Depositions not used at trial cannot be the basis for a judicial decision. Though the lines delimiting the common law right of access are vague, *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598–99, 98 S.Ct. 1306, 1312–13, 55 L.Ed.2d 570 (1978), we believe they do not include documents not used at trial.[12]

Similarly, there is no first amendment right of access[13] to discovery materials not used at trial. Though the Post argued the public has a constitutional right of access to judicial proceedings and materials, citing, *inter alia, Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (Brief for Appellee at 55), we do not believe that

what a party may do with materials obtained in discovery"); *Wilk v. American Medical Ass'n,* 635 F.2d 1295, 1299 (7th Cir.1980) (quoting *American Telephone and Telegraph Co. v. Grady,* 594 F.2d 594, 596 (7th Cir.1978)) ("[a]s a general proposition, pretrial discovery must take place in the [sic] public unless compelling reasons exist for denying the public access to the proceedings"); *In re Halkin,* 598 F.2d 176, 188 (D.C.Cir.1979) ("without a protective order materials obtained in discovery may be used by a party for any purpose, including dissemination to the public").

The treatises on civil procedure reach a similar conclusion. Professors Wright and Miller acknowledge that "[o]rdinarily a deposition is a public document freely open to inspection after it is filed with the clerk." 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE, § 2042 (1970). 4A J. MOORE, J. LUCAS & D. EPSTEIN, MOORE'S FEDERAL PRACTICE ¶ 30.63[6] (1983) ("Former Equity Rule 55 provided that a deposition shall be deemed published when filed, unless otherwise ordered by the court. That this rule is continued under the Federal Rules is shown by the provision of Rule 30(b) [now 26(c)(6) ] permitting the court in a proper case to make a protective order 'that after being sealed the deposition shall be opened only by order of the court.' "); 7 E. KOEBER, CYCLOPEDIA OF FEDERAL PROCEDURE, ¶ 25.265 (1971) (depositions generally may be opened by the clerk unless an order is obtained).

11. In *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the Supreme Court noted that "courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Id.* at 597, 98 S.Ct. at 1312 (footnotes omitted). Interests supporting such access include "the citizen's desire to keep a watchful

eye on the workings of public agencies," and "a newspaper publisher's intention to publish information concerning the operation of government." *Id.* at 598, 98 S.Ct. at 1312. In *United States v. Criden,* 648 F.2d 814, 822 (3d Cir. 1981), the Third Circuit emphasized that such access allowed "public supervision and inspection of courtroom proceedings, and the public's interest in learning of important matters." The Supreme Court in *Warner Communications* also noted that this common law right of access is not absolute. More specifically, it recognized that "courts have refused to permit their files to serve as ... sources of business information that might harm a litigant's competitive standing ...." 435 U.S. at 598, 98 S.Ct. at 1312.

12. In *Joy v. North,* 692 F.2d 880 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), the court endorsed a similar view: "Discovery involves the use of compulsory process to facilitate orderly preparation for trial, not to educate or titilate the public.... At the adjudication stage, however, very different considerations apply. An adjudication ... should ... be subject to public scrutiny." 692 F.2d at 893. *See also United States v. Hubbard,* 650 F.2d 293, 333 (D.C.Cir. 1980) (MacKinnon, J., dissenting) ("the public should have access to the testimony and written evidence in the record upon which the court relied in making its decision").

13. Any first amendment right of access to the fruits of discovery held by the public is to be distinguished from a first amendment right of free expression of material obtained in discovery held by the litigants. We discuss here only the public's right of access and defer discussion of the litigants' right of free expression to Part V *infra.*

such a right extends to the disputed depositions. In *Richmond Newspapers,* the Court held that the Constitution preserves a public right of access to criminal trials. At the same time, however, the Court explicitly distinguished *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), which held that the press and public could be constitutionally excluded from a pretrial suppression hearing.[14] *Id.* at 394, 99 S.Ct. at 2912. In *Richmond Newspapers,* the Chief Justice began the plurality opinion by noting that right of access to criminal trials was an issue of first impression: "In *Gannett Co. v. DePasquale,* ... the Court was not required to decide whether a right of access to *trials,* as distinguished from hearings on *pre* trial motions, was constitutionally guaranteed." 448 U.S. at 564, 100 S.Ct. at 2820. After recognizing the constitutional right of access to criminal trials, the Chief Justice again distinguished *Gannett:* "In contrast to the pretrial proceeding dealt with in *Gannett,* there exist in the context of the trial itself various tested alternatives to satisfy the constitutional demands of fairness." *Id.* at 581, 100 S.Ct. at 2829. Thus, even after *Richmond Newspapers,* there appears to be no constitutional right of access to criminal or civil pretrial proceedings.

More conclusively, in *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 608–10, 98 S.Ct. 1306, 1317–18, 55 L.Ed.2d 570 (1978), the Supreme Court held that no constitutional right of access inheres either in the first or sixth amendment to copy and disseminate judicial records or evidence used at trial. It follows *a fortiori* that no constitutional right of access exists with regard to discovery materials never used at trial. *Accord, Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 913–14 (E.D.Pa.1981).

In sum, the presumptive openness of discovery materials not used at trial derives only from the Federal Rules of Civil Procedure. No right of access to such materials lies either in the common law or the Constitution.

### III. PRIVACY INTERESTS THAT OVERCOME THE PRESUMPTION OF OPENNESS

#### A. The Federal Rules of Civil Procedure and the Common Law

The same statutory scheme that provides for public access to discovery materials acknowledges that a litigant's privacy interests may require those materials to be sealed from the public. Federal Rule of Civil Procedure 26(c) empowers a court, upon a showing of good cause, to order that discovery not be had, Fed.R.Civ.P. 26(c)(1); that it be conducted according to a certain method, Fed.R.Civ.P. 26(c)(3); or that its scope be limited, Fed.R.Civ.P. 26(c)(4).[15]

---

**14.** The Chief Justice, in his concurring opinion in *Gannett Co. v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979), noted that:
[D]uring the last 40 years in which the pretrial processes have been enormously expanded, it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants. A pretrial deposition does not become part of a "trial" until and unless the contents of the deposition are offered in evidence.
*Id.* at 396, 99 S.Ct. at 2914 (Burger, C.J., concurring).

**15.** Federal Rule of Civil Procedure 26(c) provides in part:
(c) PROTECTIVE ORDERS. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or

While the first six subparts of Rule 26(c) speak to the method and scope of discovery, subpart seven specifies the *kind* of information that warrants protection: "[T]he court ... [may] order ... (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way ...." Fed.R.Civ.P. 26(c)(7).[16] The drafters of the Federal Rules specially provided that the presumption of openness is out-weighed by a litigant's privacy interests in sensitive commercial information.[17]

Respect for sensitive commercial information has also enjoyed a long tradition at common law. The *Restatement on Torts* recognized that "[o]ne who, for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information."[18] Typical

---

information enclosed in sealed envelopes to be opened as directed by the court.

**16.** The Federal Rules of Civil Procedure have since their inception recognized the importance of protecting the litigants' interests in maintaining the confidentiality of commercial information. FED.R.CIV.P. 30(b) (1938) (providing that a court may order "that secret processes, developments, or research need not be disclosed.") The advisory committee note indicated that Rule 30(b) was "introduced as a safeguard for the protection of parties and deponents on account of the unlimited right of discovery given by Rule 26 [Depositions Pending Action—Scope of Examination]." FED.R. CIV.P. 30(b), advisory committee note (1938).

In 1970, the discovery provisions were rearranged so that the substance of Rule 30(b) became Rule 26(c). Accompanying the rearrangement was a change in text regarding protection of commercial information. The committee substituted broader language offering more protection which "reflects existing law." Advisory committee note, 48 F.R.D. 487, 505 (1970). The text of this provision has remained unchanged to date. *See supra* note 15.

Even before the Federal Rules of Civil Procedure became law in 1938, courts were protecting litigants from disclosure of confidential information unnecessary to the litigation of the claim. *See, e.g., Stone v. Goss,* 65 N.J.Eq. 756, 762–63, 55 A. 736, 738 (1903) ("Such a disclosure [to the court *in camera* of an allegedly stolen trade secret] is no publication to the world, and, although it may endanger the complainants' secret, it does not deprive them of the right to enjoin the defendants from making use of it."); *Williams v. The Prince of Wales Life Ins. Co.,* 23 Beav. 338, 340, 53 Eng.Rep. 133, 133 (1857) (court ordered the production of certain confidential documents only "upon the Plaintiff's undertaking not to make public or communicate to any stranger to the suit the contents of such documents").

**17.** Courts have continually followed the lead of the drafters of the Federal Rules in protecting confidential information from public disclosure in pretrial discovery. *See, e.g., Centurion Industries, Inc. v. Warren Steurer and Associates,*

665 F.2d 323, 32 F.R.S.2d 1413, 1415–17 (10th Cir.1981) (confidential information regarding software design discoverable subject to protective order prohibiting public disclosure); *Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 889 (E.D.Pa.1981) ("The propriety ... of [umbrella] protective orders securing ... sensitive commercial information ... is too well established to belabor here."); *Liberty Folder v. Curtiss Anthony Corp.,* 90 F.R.D. 80, 82–83 (D.Ohio 1981) (court issues protective order to guard against unnecessary and potentially injurious disclosure of sensitive information such as distributor, vendor, and customer lists).

Congress has shown a similar awareness in other statutes of the need to protect sensitive commercial information when obtained through compulsory processes. *See, e.g.,* 5 U.S.C. § 552(b)(4) (1982) (agency need not disclose under Freedom of Information Act trade secrets and confidential commercial and financial information); Privacy Act of 1974, 5 U.S.C. § 552a(b) (1982) (prohibits disclosure of personal information without consent except in certain circumstances); Internal Revenue Code, 26 U.S.C. § 6103 (1976 & Supp. V 1981) (prohibits disclosure of data regarding business affairs given for purposes of tax collection).

**18.** RESTATEMENT OF THE LAW, TORTS § 759 (1939). Comment b to § 759 defines the kinds of information referred to in this provision:

Examples of information, other than trade secrets, included in this Section are: the state of one's accounts, the amount of his bid for a contract, his sources of supply, his plans for expansion or retrenchment, and the like. There are no limitations as to the type of information included except that it relate to matters in his business. Generally, however, if the improper discovery of the information is to cause harm, the information must be of a secret or confidential character.

The RESTATEMENT OF THE LAW, TORTS § 757, Comment b (1939), defines "trade secret" broadly:

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advan-

of the broad protection given commercial information at common law are comments in *Witkop & Holmes Co. v. Boyce,* 61 Misc. 126, 112 N.Y.S. 874 (1908):

> The names of the customers of a business concern whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up, should be deemed just as sacred and entitled to the same protection as a secret of compounding some article of manufacture and commerce.

*Id.* 112 N.Y.S. at 878.[19] Protection of trade information extends well back into the nineteenth century.[20]

### B. *Constitutional Privacy Interests*

#### 1. Constitutional Right of Nondisclosure of Personal Information

Recent Supreme Court decisions indicate that a litigant's interest in avoiding public disclosure of private information is grounded in the Constitution itself, in addition to federal statutes and the common law. In *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Supreme Court considered a New York statute that required information about the dispensing of certain drugs to be filed with the State Health Department. A group of patients who reg- ularly received those drugs claimed the statute violated their constitutional right to privacy. In deciding the claim, the Court clarified the privacy interests protected by the Constitution:

> The cases sometimes characterized as protecting "privacy" have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.

*Id.* at 598–600, 97 S.Ct. at 875–877 (footnotes omitted). Justice Brennan, in his concurrence, stressed the Court's recognition of an individual's "interest in avoiding disclosure of personal matters." *Id.* at 606, 97 S.Ct. at 880 (Brennan, J., concurring). Though the Court upheld the New York statute, Justice Brennan noted that "[b]road dissemination by state officials of such information ... would clearly implicate constitutionally protected privacy rights, and would presumably be justified only by compelling state interests." *Id.*

In *Nixon v. Administrator of General Services (A.G.S.),* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court reaffirmed that "one element of privacy" is " 'the individual interest in avoiding disclosure of personal matters,' " 433 U.S. at 457, 97 S.Ct. at 2797 (quoting *Whal-*

---

tage over competitors who do not know or use it.

These provisions of the Restatement are evidence of the broad protection afforded confidential commercial information at common law.

Courts have offered three grounds for this protection of confidential commercial information: (1) property rights in the secret information, *Tabor v. Hoffman,* 118 N.Y. 30, 23 N.E. 12 (1889); (2) contract rights in securing confidentiality, *Westervelt v. National Paper & Supply Co.,* 154 Ind. 673, 57 N.E. 552 (1900); and (3) a fiduciary obligation not to disclose, *Du Pont Powder Co. v. Masland,* 244 U.S. 100, 37 S.Ct. 575, 61 L.Ed. 1016 (1917).

19. *See also* Barton, "A Study in the Law of Trade Secrets," 13 U.Cin.L.Rev. 507, 521 (1939) ("the concept [of protecting trade secrets involving manufacturing processes] ... has been extended to every variety of business secret that has value to the owner"); J. Story, Equity Jurisprudence (1853) § 952 ("Courts of Equity will restrain a party from making a disclosure of secrets, communicated to him in the course of a confidential employment. And it matters not, in such cases, whether the secrets be secrets of trade or secrets of title, or any other secrets of the party important to his interests." (footnote omitted)).

20. *See, e.g., Pressed Steel Car Co. v. Standard Steel Car Co.,* 210 Pa. 464, 60 A. 4 (1904) (an owner of a confidential instrument or document does not surrender rights thereto by delivering it to a bailee for a limited purpose); *Peabody v. Norfolk,* 98 Mass. 452, 458 (1868) (there is a property interest in process of manufacturing "which a court of chancery will protect against one who in violation of contract and breach of confidence undertakes to apply it to his own use, or to disclose it to third persons"); *Yovatt v. Winyard,* 1 Jac. & W. 394, 37 Eng.Rep. 425 (1820) (court grants injunction against employee disclosing confidential recipes obtained in course of employment).

**1020**

en v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977)). There the Court upheld the Presidential Recordings & Materials Preservation Act, Pub.L. No. 93–526, Title I, note following 44 U.S.C. § 2107 (1976), directing the Administrator of General Services to screen the Presidential materials. The Administrator was instructed to return the President's private information and preserve information having historical value. The Court indicated that Mr. Nixon's constitutional right to avoid disclosure of personal matters derived from legitimate expectations of privacy. 433 U.S. at 458, 97 S.Ct. at 2797. It relied mostly on fourth amendment case law and analysis in evaluating the privacy claim. The implication is that the constitutional right to nondisclosure is rooted primarily in the fourth amendment. Id. at 458–65, 97 S.Ct. at 2797–01.

Also, in both Whalen, 429 U.S. at 600–02, 97 S.Ct. at 876–78, and Nixon v. A.G.S., 433 U.S. at 458, 97 S.Ct. at 2797, the Court recognized the difference in intrusiveness between disclosures only to state employees and disclosures to the general public. The Court implied in both cases that strong governmental interests would be necessary to justify the latter, more severe intrusion on confidential matters. See Whalen, 429 U.S. at 606, 97 S.Ct. at 879 (Brennan, J., concurring). The fact that measures were taken to guard against such public dissemination figured importantly in the holdings favoring disclosure to the respective agencies.

The Fifth and Third Circuit Courts of Appeals have interpreted Whalen and Nixon as recognizing a constitutional right of confidentiality in personal matters. In Plante v. Gonzalez, 575 F.2d 1119 (5th Cir. 1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), five state senators argued that Florida's Sunshine Amendment requiring disclosure of financial information violated their constitutional right

"not to be known." Judge Wisdom, speaking for the Fifth Circuit, noted that financial privacy falls directly within the constitutional protection extended to personal matters against public disclosure. Id. at 1132. Also, he specifically acknowledged that disclosure of personal information to the public represented a more severe intrusion on privacy interests than disclosure only to state employees. Id. at 1133. Finally, however, after recognizing that financial privacy is a "matter of serious concern, deserving strong protection," the court concluded that the public interest in disclosure for elected officials was even stronger. Id. at 1136–38. See also Fadjo v. Coon, 633 F.2d 1172, 1175–76 (5th Cir.1981) (recognizing constitutional right of nondisclosure in personal information collected in criminal investigation).

In United States v. Westinghouse Electric Corp., 638 F.2d 570 (3d Cir.1980), Westinghouse claimed that a request by the National Institute for Occupational Safety and Health (NIOSH) for medical records of Westinghouse's employees violated its employees' right to nondisclosure of their personal records. The Third Circuit recognized that "[t]here can be no question that an employee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." Id. at 577. After an exhaustive consideration of the litigants' respective interests, the court nonetheless concluded that the "strong public interest in facilitating the research and investigations of NIOSH justifies the minimal intrusion into the [employees'] privacy . . . ." Id. at 580.[21]

The significance in this context of the Supreme Court's decisions in Whalen and Nixon v. A.G.S., and of the Third and Fifth Circuits' respective decisions in Westinghouse and Plante, lies in their explicit recognition of the constitutional right to avoid

21. See also Doe v. Webster, 606 F.2d 1226, 1238 n. 49 (D.C.Cir.1979) (recognizing individual's right to privacy in choosing extent to which the government may disclose criminal information about him where no countervailing government interest asserted); but see J.P. v. DeSanti, 653 F.2d 1080 (6th Cir.1981) (no constitutional right of nondisclosure in juvenile social histories prepared by state).

disclosure of personal matters. In the discovery process, individuals are often forced by the court to disclose the kind of personal information deserving privacy protection under these decisions. An individual's constitutional privacy interest can thus be implicated by the discovery process to the same extent it is implicated by disclosure requirements of statutes.[22] In both instances, the government is forcing disclosure of personal information. For the facts at hand, we must now examine whether this constitutional right of nondisclosure applies to corporations in the discovery context.

### 2. Corporations' Constitutional Interests in Nondisclosure of Confidential Discovery Materials Not Used at Trial

■ In *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court noted that corporations are not without constitutional rights:

> The ... court did not go so far as to accept appellee's argument that corporations, as creatures of the State, have only those rights granted them by the State. The court below recognized that such an extreme position could not be reconciled either with the many decisions holding state laws invalid under the Fourteenth Amendment when they infringe protected speech by corporate bodies, or with decisions affording corporations the protection of constitutional guarantees other than the First Amendment. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 353 [97 S.Ct. 619, 629, 50 L.Ed.2d 530] (1977) (Fourth Amendment).

*Id.* at 778 n. 14, 98 S.Ct. at 1417 n. 14 (citations omitted). The Court's acknowledgment of corporations' fourth amendment rights in *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977), is significant. There, corporate books and records were seized without a warrant by the Internal Revenue Service for the purposes of satisfying tax assessments. The Court noted that "respondents do not contend that business premises are not protected by the Fourth Amendment. Such a proposition could not be defended in light of this Court's clear holdings to the contrary. Nor can it be claimed that corporations are without some Fourth Amendment rights." *Id.* at 353, 97 S.Ct. at 629 (citations omitted).[23]

The Seventh Circuit, in *Civil Aeronautics Board v. United Airlines, Inc.,* 542 F.2d 394 (7th Cir.1976), denied the Civil Aeronautics Board's petition for immediate and unconditional access to United Airlines' land, buildings, accounts, and records. The court emphasized that agency demands for corporate documents must be "reasonably definite and reasonably relevant to some proper legislative purpose" to avoid "serious problems under the Fourth Amendment." *Id.* at 399. It then endorsed a particularly relevant admonition by Judge Leventhal in *Burlington Northern, Inc. v. ICC,* 462 F.2d 280 (D.C.Cir. 1972):

> The items involved are internal papers that stand at the heart of management effort, and so long as our carrier operations are rooted in private enterprise there is a strong element of privacy in such items. That is ... a reason for limiting the occasion of ... production—

---

**22.** *See also Rhinehart v. Seattle Times Co.,* 98 Wash.2d 226, 239–43, 654 P.2d 673, 681–83 (1982), *cert. granted,* —— U.S. ——, 104 S.Ct. 64, 78 L.Ed.2d 80 (1983) (recognizing significant federal constitutional privacy interests in litigants' maintaining the confidentiality of personal information produced in discovery).

**23.** In *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979), the Supreme Court protected Detroit Edison's "legitimate and substantial" concern for maintaining the secrecy of employment aptitude tests. The NLRB ordered the Company to disclose to the

union employees' scores in psychological aptitude tests. The NLRB did not, however, adequately protect the tests from public disclosure or support its order with a principle of national labor policy requiring such disclosure. Unlike *G.M. Leasing Corp.,* however, the Court did not explicitly ground the Company's confidentiality interests on legitimate fourth amendment privacy expectations. Instead, it assumed the reasonableness of the Company's concern for test secrecy, and then looked for a substantial reason supporting infringement on that concern. *Id.* 440 U.S. at 314–17, 99 S.Ct. at 1130–32.

by agency or judicial limitation—and for forbidding its disclosure outside the agency except under careful conditions subject to court review.[24]

*Id.* at 288 (Leventhal, J., separate statement dissenting from denial of petition for rehearing) (*quoted, in part, in* 542 F.2d at 399). These decisions establish that a corporation possesses legitimate constitutional expectations of confidentiality in internal commercial information.

In charting a corporation's privacy protection, however, we note that a corporation's right to nondisclosure is not equal to that of an individual. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 779 n. 14, 98 S.Ct. 1407, 1417 n. 14, 55 L.Ed.2d 707 (1978). The Court recognized in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), that:

> [N]either incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret.
>
> While they may and should have protection from unlawful demands made in the name of public investigation, corporations can claim no equality with individuals in the enjoyment of a right to privacy. They are endowed with public attributes. They have a collective impact upon society, from which they derive the privilege of acting as artificial entities.... [L]aw-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest.

*Id.* at 65–66, 94 S.Ct. at 1519–1520 (citations omitted) (quoting *United States v. Morton Salt Co.,* 338 U.S. 632, 651–52, 70 S.Ct. 357, 368–69, 94 L.Ed. 401 (1950)). We thus conclude that while corporations do enjoy privacy protection under the fourth amendment, that protection is qualified to allow adequate policing of corporate conduct. The government must be free to ensure "that corporate behavior is consistent with the law and the public interest." *United States v. Morton Salt Co.,* 338 U.S. at 652, 70 S.Ct. at 369. Thus, corporations must disclose information to regulatory agencies so long as "the demand is not too indefinite and the information sought is reasonably relevant." *Id.*

Discovery, however, is not conducted to police or regulate litigants, but to prepare for the trial of a dispute. The purpose of discovery is not affected by the fact that a party to the suit is a corporation. Therefore, in the context of confidential discovery materials not used at trial, a corporation's privacy interest in nondisclosure is essentially identical to that of an individual.[25]

### 3. The Applicable Constitutional Standard

■ We turn to the standard by which this constitutional interest in confidentiality is to be protected. The Supreme Court, in both *Whalen,* 429 U.S. at 600–04, 97 S.Ct. at 876–79, and *Nixon v. A.G.S.,* 433 U.S. at 458–65, 97 S.Ct. at 2797–2801, determined the propriety of a governmental intrusion by balancing the need for the intrusion against its severity. This approach comports with that taken by the Court in traditional fourth amendment warrant analysis. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its extensive progeny, the Court emphasized the importance of "balancing the need to search [or seize] against the invasion which the search

---

**24.** Similarly, in *OKC Corp. v. Williams,* 490 F.Supp. 560 (N.D.Tex.1979), aff'd, 614 F.2d 58 (5th Cir.1980), the district court noted that the government's coercing an informer to turn over to a regulating agency a corporation's confidential internal investigation report "should raise serious Fourth Amendment questions." 490 F.Supp. at 562 n. 1.

**25.** *See G.M. Leasing Corp.,* 429 U.S. at 354, 97 S.Ct. at 629. Integral to the Court's holding that the warrantless seizure of corporate records for purposes of tax assessments violated the corporation's fourth amendment right was that "the intrusion into petitioner's privacy was not based on the nature of its business, its license, or any regulation of its activities.... [W]e find no justification for treating petitioner differently in these circumstances simply because it is a corporation." The implication here is that a corporation's legitimate privacy expectations are heightened when intrusions are not grounded in a regulatory context.

[or seizure] entails." *Terry,* 329 U.S. at 21, 88 S.Ct. at 1879 (quoting *Camara v. Municipal Court,* 387 U.S. 523, 537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967)). Additionally, all lawful privacy intrusions must be narrowly drawn and "reasonably related in scope to the justification for their initiation." 392 U.S. at 29, 88 S.Ct. at 1884.

Other circuits agree that Supreme Court case law requires a balancing test in determining the lawfulness of intrusions on privacy interests. In *Plante v. Gonzalez,* 575 F.2d 1119 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979), the Fifth Circuit concluded that "the balancing test . . . is appropriate" in judging intrusions on an individual's right to avoid disclosure of personal matters. *Id.* at 1134. "The constitutionality of the [disclosure requirement] will be determined by comparing the interests it serves with those it hinders." *Id.* (footnote omitted). In *United States v. Westinghouse Electric Corp.,* 638 F.2d 570 (3d Cir.1980), the court characterized the process of determining the extent of privacy protection as a "delicate task of weighing competing interests." *Id.* at 578.

On the basis of this case law, we adopt a balancing approach in determining the lawfulness of intrusions on protected nondisclosure rights. Such a balancing standard should afford necessary flexibility in serving conflicting interests in disclosure and confidentiality. We add, however, that our adoption of a balancing approach does not preclude in all circumstances the government's need to present a compelling interest to justify an intrusion. Indeed, when the intrusion is severe, a compelling interest is required to justify the intrusion. "Severe" intrusions include public dissemination of confidential information as opposed to disclosure of such information only to the government or other litigants. *See Whalen,* 429 U.S. at 606, 97 S.Ct. at 880 (Brennan, J., concurring) ("Broad dissemination by state officials of [personal] information . . . would presumably be justified only by compelling state interests.")

## IV. MOBIL'S PRIVACY INTERESTS BALANCED AGAINST THE SEVERITY OF THE INTRUSION AND THE REASONS FOR DISCLOSURE

### A. *Mobil's Privacy Interests*

■ In this case, Mobil has a constitutionally protected privacy interest in avoiding the public disclosure of sensitive commercial information not used at trial. Given the long tradition of common law protection of confidential commercial information, *see supra* Part III(A), and the crucial importance of such material to continuing business operations, a company's sensitive commercial documents not yet in the public domain fall within the Constitution's protection of corporate privacy interests. Few categories of business information are more analogous to individuals' constitutionally protected personal affairs than trade secrets and related commercial information.

As discussed in Part I, Mr. Walter E. MacDonald submitted an affidavit in June 1981 outlining the categories of documents requested by the Post, and specifying why these categories of documents should remain confidential. R.E. at 147–50. In Mr. MacDonald's affidavit of May 31, 1983, he confirmed that the disputed documents were indeed of the kind anticipated in the June 1981 affidavit. R.E. at 203–04, 211–12.

The Post points out that Mr. MacDonald was unable "to review more than a very few of these numerous depositions or exhibits." R.E. at 211. The Post thereby challenges Mobil's position that these documents are in fact confidential. It contends that Mobil should be forced to show specifically which documents contain sensitive commercial information. (Brief for Appellee at 43–48). We do not believe a document-by-document specification of confidentiality is necessary. Rather, we agree with the practical wisdom of Judge Edward Becker:

Wholesale designations without repeated objection facilitate the discovery process. If a judge, magistrate, or special master had to rule upon countless invocations of Rule 26(c)(7), the progress of complex

cases would be severely impeded. Indeed, the judge is a veritable hostage; failure to approve an umbrella protective order is a consignment to years of adjudication of the confidentiality of individual documents. Moreover, it is enormously expensive to have thousands of documents reviewed by paralegals and lawyers and to brief and argue their confidentiality to the court. Needless to say, the skyrocketing cost of litigation is a matter of genuine concern to everyone involved in the legal process.

*Zenith Radio Corp. v. Matsushita Electric Industrial Co.,* 529 F.Supp. 866, 879 n. 18 (E.D.Pa.1981).

We also believe the procedural context of the instant case is important. There is a qualitative difference between a party's sustaining the confidentiality of a single document at the time of its designation and its sustaining the confidentiality of thousands of documents *en masse* long after they have been produced and given a confidential designation. *See Zenith Radio,* 529 F.Supp. at 893. The November 5, 1981 protective order obtained by Mobil contemplated objections to specific documents. The Post, instead of complying with the protective order, moved after trial for a blanket unsealing of all documents in the court record, including the depositions here at issue. R.E. at 252, 267–69.

Given the number of documents at issue and the procedural posture of this case, we think the documents should be judged according to categories of information. *See*

*Zenith Radio,* 529 F.Supp. at 887, 888, 892. The proponent of confidentiality must show only that the disputed documents contain a given category of confidential information, and that disclosure of that kind of information will harm the proponent's competitive position. Once a litigant makes such a showing, it has established its constitutionally protected interest in avoiding disclosure of these documents. In order for the court to compel disclosure of such documents, it must articulate substantial supporting interests. The requisite strength of the interests will vary according to the severity of the intrusion.

Here, Mobil succeeded in confirming that the 3800 pages of depositions designated confidential contained a kind of information that, if revealed, would harm its competitive position. Though we admonish Mobil that its showing was barely sufficient, Mr. MacDonald's two affidavits and accompanying exhibit, R.E. at 203–23, specified and confirmed that the depositions covered confidential shipping arrangements. Also, Mr. MacDonald attested that the information in the depositions was not yet in the public domain.[26] Indeed, Mobil had taken "considerable care to maintain this information as non-public, proprietary material." R.E. at 211. In light of the difficulty of responding to a wholesale, post-trial motion to unseal, we find Mobil's references to categories of information sufficiently specific to establish its constitutionally protected interest in nondisclosure of the depositions.[27]

---

**26.** Situations do arise where the reason for keeping the information confidential has expired by the end of trial—as where, for example, the protective order was entered to protect against prejudicial pretrial publicity. *See, e.g., In re Halkin,* 598 F.2d 176, 183 n. 11 (D.C.Cir. 1979), and 203 n. 12 (Wilkey, J., dissenting). In those cases, the judge might very well wish to reconsider the wisdom of keeping the information sealed. In this case, however, Mobil established satisfactorily that the unused information contained in the contested depositions was entitled to full confidentiality. Absent some compelling reason, the trial judge was consequently obligated to protect Mobil's continuing interest in privacy.

**27.** Mobil's constitutional privacy interest in the disputed depositions is strengthened by the fact that Mobil is essentially a nonparty to the libel suit out of which this action arose. (Mobil intervened in the *Tavoulareas* suit only to protect the confidentiality of its commercial information. *See supra* notes 4 and 5.) This court in *United States v. Hubbard,* 650 F.2d 293 (D.C. Cir.1980), noted:

An important element in this case is the fact that the party from whom the documents were seized was not made a defendant in the proceedings and now objects to public access to the fruits of the seizure. We think that where a third party's property and privacy rights are at issue the need for minimizing intrusion is especially great and the public

## B. *The Governmental Intrusion and the Justifying Interests*

The intrusion of the district court's June 21, 1983 order on Mobil's privacy interest is indeed severe. The November 5, 1981 protective order, in comparison, represented a narrowly drawn, relatively minor intrusion on Mobil's protected privacy interests. Also, that intrusion was justified by the substantial interest of ensuring "the fullest possible knowledge of the issues and facts before trial." *Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947). By unsealing the depositions, the district court has sanctioned public dissemination of Mobil's sensitive commercial information. Since public dissemination constitutes a severe intrusion, only a compelling interest can save the order to unseal. *See Whalen,* 429 U.S. at 606–07, 97 S.Ct. at 879–80 (Brennan, J., concurring).

The reasons cited by the district court for unsealing the depositions are inadequate. The court simply concluded that "[i]t is sufficient merely to state that the justification Mobil has provided is not specific enough to warrant the continued sealing of these documents." R.E. at 232. We have determined, however, that Mobil's justification, when examined in light of the procedural posture of this case and of the number of documents at issue, was sufficient to show the disputed documents contained information of the kind deserving constitutional protection.

The interests underlying the presumption of openness discussed in Part II also fail to support the district court's order to unseal. The presumption of openness is not absolute, as it is qualified by Federal Rule of Civil Procedure 26(c)(7) (providing for protection of confidential commercial information). Moreover, the interests underlying the presumption of openness here are purely statutory, *see supra* Part II, and pale in the face of Mobil's constitutional interests in nondisclosure.

The Post argues, however, that its constitutional freedom to publish under the first amendment compelled the district court's June 21 order to unseal. Brief for Appellee at 29–38. The Post claims that Mobil failed to meet its burden of showing that "the harm posed by dissemination [will] be substantial and serious; the restraining order [was] narrowly drawn and precise; and there [was] no alternative means of protecting the public interest which intrudes less directly on expression." *Id.* at 30–31 (emphasis omitted) (quoting *In re Halkin,* 598 F.2d 176, 191 (D.C.Cir.1979)). The district court also made a vague reference to the Post's first amendment interests:

> Any restrictions, such as those contained in this Court's November 5, 1981 protective order, on how materials obtained through discovery are utilized clearly infringes on certain First Amendment rights. *In re Halkin,* 598 F.2d 176, 190 (D.C.Cir.1979). Despite the fact that these rights are not absolute, it is only under the most unusual circumstances that they should give way to a party's demands for secrecy.

R.E. at 229.

The district court's severe intrusion on Mobil's privacy interest could arguably be justified if it were necessary to avoid an infringement on the Post's unqualified first amendment free expression rights. Our analysis accordingly shifts to examine the scope of the Post's first amendment interest in disseminating the depositions and whether that interest justifies the court's order to unseal.

## V. FIRST AMENDMENT FREE EXPRESSION ANALYSIS

We begin by noting that the Post's status as a member of the institutional press gives it no greater constitutional interest in free expression than that held by individuals. The Supreme Court has recognized this principle in the context of a constitutional

---

interest in access to materials which have never been judicially determined to be relevant to the crimes charged is especially small.

*Id.* at 319 (footnote omitted).

right of access to information. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609–10, 98 S.Ct. 1306, 1317–18, 55 L.Ed.2d 570 (1978); *Saxbe v. Washington Post Co.,* 417 U.S. 843, 94 S.Ct. 2811, 41 L.Ed.2d 514 (1974). We believe this equality of protection regarding access applies as well to the right of expression afforded the institutional press and individuals under the press and speech clauses of the first amendment. *First National Bank v. Bellotti,* 435 U.S. 765, 797–802, 98 S.Ct. 1407, 1426–1429, 55 L.Ed.2d 707 (1978) (Burger, C.J., concurring); *Avins v. White,* 627 F.2d 637, 649 (3d Cir.1980), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980); *Davis v. Schuchat,* 510 F.2d 731, 734 n. 3 (D.C.Cir. 1975). Our discussion will therefore focus on the free expression interests (deriving either from the speech or press clause) of litigants generally in discovery materials.

In *In re Halkin,* 598 F.2d 176 (D.C.Cir. 1979), this court concluded that the first amendment right of unfettered expression attaches to materials made available through discovery. *Id.* at 186–91. In reaching this conclusion, the court denied that the source of information can affect the free expression interest of the speaker. *Id.* at 187–90. Judge Wilkey's dissent in *In re Halkin,* however, asserts to the contrary that the source of information can significantly qualify the recipient's free expression interest. *Id.* at 206–07 (Wilkey, J., dissenting). The year after *In re Halkin* was decided, the Supreme Court in *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam), indirectly spoke on this issue. The upshot, we believe, is that the source of information may in some instances qualify the strength of a recipient's first amendment interest in disclosing that information.

In *Snepp,* the Supreme Court held that a CIA employee, with or without a consent agreement, is subject to restrictions on disclosing confidential information obtained in the course of CIA employment. The Court noted:

> [E]ven in the absence of an express agreement[,] the CIA could have acted to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment. The Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.

444 U.S. at 509 n. 3, 100 S.Ct. at 765 n. 3 (citations omitted). Integral to the Court's holding was that Mr. Snepp "had been 'assigned to various positions of trust' . . . and granted 'frequent access to classified information . . . .' Snepp published his book about CIA activities on the basis of this background and exposure." *Id.* at 511, 100 S.Ct. at 766 (citation and footnote omitted).

Though the facts in *Snepp* involved governmental employer-employee relations, the case sheds light on a broader principle of first amendment law. *Snepp* demonstrates that the government may regulate the use of confidential information it supplies a citizen. The extent of permissible regulation depends upon the balancing of the government's interest in confidentiality and the individual's interest in free expression.[28] Regardless of how that balance is struck in any given case, it remains certain that a citizen's right of free expression of confidential information received directly from the government is not unfettered. Rather, this right is qualified and must be balanced against the government's legitimate inter-

---

**28.** *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), where the Court noted:

> [I]t cannot be gainsaid that the state has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to

arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1734. *See also Connick v. Myers,* —— U.S. ——, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983) (quoting *Pickering*).

est in controlling the use of information it dispenses.[29]

In the discovery context, the government is in a very real sense the direct source of discovered materials since those materials are made available only through the compulsory processes of the court. A litigant's interest in disseminating information obtained through the court's processes consequently is not unfettered. Rather, the litigant's qualified expression interest must be balanced against the court's interest in preserving the confidentiality of private information it has supplied that litigant. Here the court has at least two interests in preserving the confidentiality of the disputed depositions. First, as discussed in Part IV, the court must avoid unjustified intrusions on Mobil's privacy interests. The court can no more sanction public dissemination of Mobil's private information absent a compelling reason than a federal agency can indiscriminately disseminate private information collected from citizens. Second, the court has an interest in preserving the integrity of the discovery process by encouraging full investigation of the disputed issues. Such investigation will occur effectively only if the court can assure the parties that disclosed confidential materials will be used only for the purpose of litigation.[30]

The First, Second, and Third Circuits have all recognized that a litigant's free expression right in confidential information supplied by the court through discovery is at best qualified. In *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir.1981), the First Circuit noted that disclosure of "undigested matter, forced from the mouth of an unwilling deponent ... would not advance the informed civic and political discussion that the First Amendment is intended to protect." *Id.* at 115. The First Circuit continued:

> We conclude, therefore, that although there is a First Amendment interest in information produced at trial that warrants full protection, a *judicially-powered process compelling information* that has not yet passed through the adversary-judicial filter for testing admissibility does not create communications that deserve full protection.

*Id.* at 115 (emphasis added).

Similarly, the Second Circuit, in *International Products Corp. v. Koons,* 325 F.2d 403 (2d Cir.1963), "entertain[ed] no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes." *Id.* at 407. The court, however, required that the protective order there at issue not curtail disclosure of information and writings obtained outside the court's processes:

> We know of no authority that a court may restrain a private citizen in peace time from giving vent to his views, or publicizing his own information, as to the conduct of officials of foreign governments ....
>
> We therefore suggest that the District Court modify its order so as to make it plain that no restrictions are imposed on the freedom of the persons named therein

---

**29.** Justice Rehnquist, in his dissenting opinion in *Central Hudson Gas and Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), noted that "[w]hile this Court has stated that the 'capacity [of speech] for informing the public does not depend upon the identity of its source,' the source of the speech nevertheless may be relevant in determining whether a given message is protected under the First Amendment." *Id.* at 585, 100 S.Ct. at 2361 (Rehnquist, J., dissenting) (citation and footnote omitted). Justice Rehnquist cited the following cases in support of this statement: *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980) (upholding Air Force regulations imposing restric-

tions on the free speech and petition rights of Air Force personnel); *Snepp v. United States, supra; Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (commissioned officer may be prohibited from publicly urging enlisted personnel to disobey orders that might send them to combat). 447 U.S. at 585 n. 2, 100 S.Ct. at 2361 n. 2 (Rehnquist, J., dissenting).

**30.** These interests in controlling the use of discovered materials arise only after a litigant from whom discovery is requested has demonstrated its need for confidentiality.

to make whatever use they wish of writings (other than papers filed in court) or information which have come into their possession otherwise than through the court's processes . . . .

*Id.* at 408, 409.

The Third Circuit in *Rodgers v. United States Steel Corp.*, 536 F.2d 1001 (3d Cir. 1976), assumed *arguendo* that "if the district court had prohibited disclosure only of information derived from the discovery processes, its order would have been constitutional." *Id.* at 1006. The court proceeded to vacate the protective order to the extent that it prohibited "petitioners' counsel from disclosing information which they obtained otherwise than through the court's processes." *Id.* at 1006–09.[31] Thus, these courts of appeals have recognized, and the Supreme Court has confirmed, that the government may control confidential information it supplies with significantly more ease than it can control confidential information obtained from independent sources.[32]

Indeed, this circuit has noted that a necessary corollary to the court's power to compel production of (*i.e.,* supply) confidential information is the power to condition the use of that information. In *Freeman v. Seligson,* 405 F.2d 1326 (D.C.Cir.1968), this court required the Secretary of Agriculture to produce materials in discovery normally protected from disclosure by section 8 of the Commodity Exchange Act. The court's decision was grounded in its capacity to promote full discovery and still protect the secrecy of the disputed information: "The courts can limit, and in actual practice do limit, the persons having access to information, their freedom to discuss the information to which they are given access, and the uses to which the information may be put." *Id.* at 1350. Implicit in this holding is the view that a litigant's free expression interest does not significantly hinder a court's controlling the use of confidential information it dispenses.

The import here is that the Post's first amendment interest in disclosing Mobil's commercial information supplied by the district court is not unfettered. Such interest, if at all existent, is not deserving of full control the use of the confidential information it supplies. In effect, this would require the government to demonstrate a compelling reason to protect its own legitimate privacy expectations. It would be equally anomalous to require a court to provide a *compelling* reason for controlling the use of confidential information obtained in discovery where a litigant's privacy interests and the integrity of the discovery process are at stake.

We note, however, that this lesser standard applies only to the regulation of information received directly from the government and not to government information independently received from a third party. *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 837–46, 98 S.Ct. 1535, 1540–45, 56 L.Ed.2d 1 (1978) (first amendment does not permit criminal punishment of *third persons who are strangers to the inquiry,* as distinguished from participants, for divulging truthful information regarding confidential proceedings); *New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam) (first amendment prohibits issuing injunction, absent compelling interest, restraining newspaper's publishing government information received from third party).

---

**31.** The Washington State Supreme Court, in *Rhinehart v. Seattle Times Co.,* 98 Wash.2d 226, 654 P.2d 673 (1982), *cert. granted,* —— U.S. ——, 104 S.Ct. 64, 78 L.Ed.2d 80 (1983), upheld a protective order limiting to trial purposes the use of certain discovered information. The court articulated its analytical approach:

In determining whether a protective order is needed and appropriate, the court properly weighs the respective interests of the parties. The judge's major concern should be the facilitation of the discovery process and the protection of the integrity of that process, which necessarily involves consideration of the privacy interest of the parties and, in the ordinary case at least, does not require or condone publicity.

98 Wash.2d at 256, 654 P.2d at 690. The Washington State Supreme Court takes the position (1) that a protective order simply is not a prior restraint at all, 98 Wash.2d at 231, 654 P.2d at 676; and (2) that even if it is considered a prior restraint, protecting the privacy interests of the litigants and the integrity of the discovery process are compelling interests that justify regulating the speech of the opposing party. 98 Wash.2d at 255–56, 654 P.2d at 689–90.

**32.** It would indeed be anomalous to require the government to proffer a *compelling* reason to

constitutional protection.[33] The Post's free expression interest in Mobil's commercial information is qualified because the Post received that information directly from the district court. The Post's free expression interest must therefore bow to the court's obligation to avoid a severe intrusion on Mobil's constitutionally protected privacy interest and to preserve the integrity of the discovery process. Consequently, respect for the Post's free expression interest cannot provide the compelling reason necessary to justify the district court's order to unseal.

## VI. CONCLUSION

Our holding in this case does not undercut in any way the first amendment's bulwark against infringements on speech independently obtained from nongovernmental sources. This decision will not require a court to evaluate the importance or propriety of speech according to its content or subjectively examine the speaker's motives for dissemination. Rather, our holding will require a court only to determine whether information obtained through its own compulsory processes may legitimately be called confidential. To allow the court to qualify the use of confidential information it supplies does not muzzle the recipient; it simply acknowledges and protects legitimate privacy expectations. The recipient remains free to comment on any related events independently discovered.

Protective orders, of course, should be narrowly drawn to guard the privacy expectations of the litigants and, if possible, to serve the primary purpose of discovery by allowing full investigation of the disputed facts and issues. Also, we recognize that a litigant's privacy interests may have to fall to the public's important interest in scrutinizing any documents providing the basis for a judicial decision.

In this case, the November 5, 1981 protective order did not silence all comment on issues covered in the depositions. *See supra* note 6. The order prohibited dissemination only of confidential information discovered from Mobil's files. Moreover, the November 5, 1981 protective order was narrowly drawn to allow the Post opportunity for full investigation of the disputed facts and issues. Finally, the depositions at issue were never used at trial, and therefore could not be the basis for a judicial decision. In the absence of a compelling interest supporting disclosure, Federal Rules of Civil Procedure 26(c)(7) provides for, and Mobil's constitutionally protected privacy interest compels, the district court to reinstate the seal on the 3800 pages of deposition transcript never used at trial.

*It is so ordered.*

---

**33.** Since the district court's interest in protecting the Post's free expression right must be compelling to justify its severe intrusion on Mobil's privacy interests, we need not specify the exact strength of the Post's free expression right, but only whether it is deserving of *full* constitutional protection. Indeed, we express no opinion on whether free expression interests exist at all in discovery materials.

Even if, however, we were to start our analysis by assuming the Post had some free expression interest in discovery materials and then identified Mobil's countervailing interests, our result would be unchanged. This court, in *McGehee v. Casey*, 718 F.2d 1137 (D.C.Cir. 1983), concluded that restrictions on "the speech of government employees must 'protect a substantial government interest unrelated to the suppression of free speech,'" and be narrowly drawn. At 1142–1143 (citations and footnote omitted). The district court's interest in protecting Mobil's privacy interests and the integrity of the discovery process, *see supra* page 1027, is at least substantial, and the seal on the disputed depositions is narrowly drawn to cover information obtained only through formal discovery processes.